# NO. 24-1636

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**EDWARD M. WILLIAMS,**

*Plaintiff/Appellant*,

**v.**

**FAIRFAX COUNTY GOVERNMENT,**

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

## OPENING BRIEF OF APPELLANT

Roya Vasseghi
VASSEGHI LAW GROUP
9663-D Main Street
Fairfax, VA 22031
Tel: (703) 215-9358
Fax: (703) 563-7401
roya@vasseghilaw.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1636      Caption: Edward M. Williams v. Fairfax County Government

Pursuant to FRAP 26.1 and Local Rule 26.1,

Edward M. Williams
_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Erin N. Schiffman          Date: 5 August 2024

Counsel for: Appellant Edward M. Williams

- 2 -

Print to PDF for Filing          Reset Form

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF CASE ......................................................................2

    A.    Statement of Facts .............................................................2

    B.    Procedural History............................................................12

    C.    The District Court's Decision ...........................................13

SUMMARY OF ARGUMENT .............................................................13

ARGUMENT ......................................................................................14

    I.    STANDARD OF REVIEW ..............................................14

    II.    THE DISTRICT COURT ERRED IN REJECTING WILLIAMS' *PRIMA FACIE* CASE OF RETALIATION BECAUSE THE TEMPORAL PROXIMITY COUPLED WITH THE FIRST OPPORTUNITY DOCTRINE, INTERVENING ACTS, AND EVIDENCE OF RETALIATORY ANIMUS SUPPORTS A CAUSAL CONNECTION SUFFICIENT TO SURVIVE SUMMARY JUDGMENT ......................................................................18

        A.    The Court failed to consider the first opportunity doctrine...........................................................................19

        B.    Williams established causal connection through intervening retaliatory acts, failures in the investigatory process, and circumstances surrounding termination supporting inference of retaliation .............................................22

            i.    HR comments discouraging Williams from moving forward with his complaints and other intervening acts support an inference of retaliation ...................................................23

i

  ii. Appellee's failure to investigate or remediate Williams' complaints supports an inference of retaliatory animus ............................................................26

  iii. Williams' increased case scrutiny and circumstances surrounding April 2020 investigation and May 6, 2020 termination cast doubt on legitimacy and support an inference of retaliatory animus stemming from intervening acts ..................................................................31

III. THE DISTRICT COURT ERRED BY FAILING TO CREDIT WILLIAMS' MATERIAL DISPUTES OF FACT THAT CONTRADICTED APPELLEE'S KEY FACTUAL CONCLUSIONS, IMPROPERLY WEIGHED THE EVIDENCE, AND RESOLVED DISPUTED ISSUES IN FAVOR OF THE MOVING PARTY ..................................................32

 A. The Court improperly engaged in functions solely in the jury's province ....................................................37

 B. Discovery practices and abuses made summary judgment inappropriate ............................................40

IV. WILLIAMS ESTABLISHED DISPUTED ISSUES OF MATERIAL FACT ON WHETHER HIS TERMINATION WAS PRETEXTUAL SUFFICIENT TO SURVIVE SUMMARY JUDGMENT ..................................................44

V. THE EVIDENCE SUPPORTS DEMIJANGO INFLUENCED TERMINATION PROCESS AND DECISION-MAKERS HAD KNOWLEDGE OF WILLIAMS' COMPLAINTS UNDER A CAT'S PAW THEORY ..................................................48

CONCLUSION ..................................................49

STATEMENT REGARDING ORAL ARGUMENT ..................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Amaré v. Lazer Spot, Inc.*,
No. 5:22-cv-00005, 2024 U.S. Dist. LEXIS 84844
(W.D. Va. May 9, 2024) ........................................................................ 36, 37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................ 15, 35, 37, 40

*Ashanti v. City of Richmond Sch. Bd.*,
No. 3:21-cv-494, 2023 U.S. Dist. LEXIS 16007
(E.D. Va. Jan. 30, 2023) ...................................................................... 48, 49

*Ballengee v. CBS Broad., Inc.*,
968 F.3d 344 (4th Cir. 2020) ........................................................................14

*Ballinger v. N.C. Agric. Extension Serv.*,
815 F.2d 1001 (4th Cir. 1987) ............................................................... 33, 38

*Barbour v. Garland*,
105 F.4th 579 (4th Cir. 2024) ........................................................ 19, 20, 21

*Clark Cnty. Sch. Dist. v. Breeden*,
532 U.S. 268 (2001) .............................................................................. 17, 22

*Coleman v. Md. Court of Appeals*,
626 F.3d 187 (4th Cir. 2010) ........................................................................24

*Dawson v. Wash. Gas Light Co.*,
No. 1:18-cv-971, 2019 U.S. Dist. LEXIS 155322
(E.D. Va. Sept. 9, 2019) ...............................................................................28

*E.E.O.C. v. Xerxes Corp.*,
639 F.3d 658 (4th Cir. 2011) ........................................................................29

*Evans v. Techs. Applications & Serv. Co.*,
80 F.3d 954 (4th Cir. 1996) ..........................................................................40

*Foster v. Univ. of Md.-E. Shore*,
787 F.3d 243 (4th Cir. 2015) ................................................................ *passim*

*Gray v. Spillman*,
925 F.2d 90 (4th Cir. 1991) ................................................................ 15, 33, 35

*Guessous v. Fairview Prop. Invs., LLC,*
    828 F.3d 208 (4th Cir. 2016) .................................................................. 47, 48

*Haynes v. Waste Connections, Inc.,*
    922 F.3d 219 (4th Cir. 2019) ...........................................................36

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.,*
    790 F.3d 532 (4th Cir. 2015) ...........................................................15

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) .........................................................................34

*J.D. ex rel. Doherty v. Colonial Williamsburg Found.,*
    925 F.3d 663 (4th Cir. 2019) ...........................................................15

*Jacobs v. N.C. Admin. Office of the Courts,*
    780 F.3d 562 (4th Cir. 2015) .............................................. 16, 36, 37

*Johnson v. United Parcel Serv., Inc.,*
    839 Fed. Appx. 781 (4th Cir. 2021) ...................................... 17, 22

*King v. Rumsfeld,*
    328 F.3d 145 (4th Cir. 2003) .............................................. 19, 44, 45

*Kolstad v. Am. Dental Ass'n,*
    527 U.S. 526 (1999) .........................................................................33

*Lettieri v. Equant Inc.,*
    478 F.3d 640 (4th Cir. 2007) ............................................... *passim*

*Mercantile Peninsula Bank v. French (In re French),*
    499 F.3d 345 (4th Cir. 2007) ...........................................................15

*Reardon v. Herring,*
    201 F. Supp. 3d 782 (E.D. Va. 2016) ..............................................20

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) .......................................................... 35, 37, 45

*Rhoads v. FDIC,*
    257 F.3d 373 (4th Cir. 2001) ...........................................................16

*Roberts v. Glenn Indus. Grp., Inc.,*
    998 F.3d 111 (4th Cir. 2021) ...........................................................18

*Ryan v. Wolf,*
    No. ELH-19-1968, 2021 U.S. Dist. LEXIS 22759 (Feb. 5, 2021) ...............44

*Sempowich v. Tactile Sys. Tech., Inc.*,
  19 F.4th 643 (4th Cir. 2021)...........................................................45

*Smith v. Sheahan*,
  189 F.3d 529 (7th Cir. 1999)...........................................................30

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011)...........................................................................49

*Strothers v. City of Laurel*,
  895 F.3d 317 (4th Cir. 2018)............................................................17

*Templeton v. First Tenn. Bank, N.A.*,
  424 Fed. Appx. 249 (4th Cir. 2011)................................................19

*Texas Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 248 (1981)..................................................................... 17, 34

*Thomas v. City of Annapolis*,
  No. BPG-16-3823, 2018 U.S. Dist. LEXIS 37019
  (D. Md. Mar. 6, 2018)..........................................................40, 41, 42

*Tolan v. Cotton*,
  134 S. Ct. 1861 (2014)................................................16, 35, 36, 37

*Walker v. Mod-U-Kraf Homes, LLC*,
  775 F.3d 202 (4th Cir. 2014)............................................................28

*Washington v. City of Charlotte*,
  219 Fed. Appx. 273 (4th Cir. 2007)................................................45

*Watson v. S. R. Co.*,
  420 F. Supp. 483 (D.S.C. 1975), *aff'd*, 542 F.2d 1170
  (4th Cir. 1976).....................................................................................33

**Statutes & Other Authorities:**

28 U.S.C. § 1291....................................................................................1

28 U.S.C. § 1331....................................................................................1

29 U.S.C. § 2617....................................................................................1

42 U.S.C. § 2000e..................................................................................2

42 U.S.C. § 2000e-2...............................................................................2

42 U.S.C. § 2000e-2(a)(1) ............................................................16

42 U.S.C. § 2000e-3 .....................................................................2

42 U.S.C. § 2000e-3(a) ................................................................16

Fed. R. Civ. P. 56 .............................................................. 15, 33, 34

Fed. R. Civ. P. 56(a) ............................................................. 12, 14

Fed. R. Civ. P. 58 .........................................................................13

Virginia Code § 15.2-209 ............................................................12

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this action under 28 U.S.C. § 1331 and 29 U.S.C. § 2617, as this was a civil action arising under the laws of the U.S. The Court entered judgment on June 7, 2024; Appellant filed a timely notice of appeal on July 8th following the final order. JA1473–1474. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

1.    Whether the District Court erred in granting summary judgment based on disputed material facts.

2.    Whether the District Court erred in granting summary judgment on Williams' Title VII retaliation claim by finding no causal connection due to lack of temporal proximity.

3.    Whether the District Court erred by failing to credit evidence that contradicted key factual conclusions, improperly weighed the evidence, and resolved disputed issues in favor of the moving party.

4.    Whether Williams met his summary judgment burden of demonstrating a genuine dispute of material fact on the question of pretext sufficient to make Appellee's proffered reason for terminating his employment a triable issue of fact.

## STATEMENT OF CASE

This appeal arises out of an action brought by Plaintiff-Appellant Edward Williams ("Williams" or "Appellant") against Defendant-Appellee Fairfax County Government (the "County" or "Appellee") for damages arising out of violations of Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e). Williams is an individual residing in Columbia, SC, and is a citizen of SC. Appellee is a municipality in corporate form, organized and existing under the laws of the Commonwealth, and has an administrative subunit/subdivision, entity, or arm, Department of Family Services ("DFS").

Specifically, this case involves Appellant's Title VII claims for sexual orientation discrimination (42 U.S.C. § 2000e-2) (Count I), hostile work environment (*id.*) (Count II), and retaliation (42 U.S.C. § 2000e-3) (Count III).

### A. Statement of Facts

Appellee hired Williams, an openly homosexual male, on July 22, 2019 for the position of Child Protective Services ("CPS") Supervisor with its Department of Family Services ("DFS"), Children Youth and Families Division ("CYF"). JA272, JA276, JA338–351. Prior to his hire, Williams possessed more than eleven years of CPS experience in DC, including four years as a supervisor. JA273–274, JA346–348, JA358, JA625. Karen DeMijango ("DeMijango") was Williams' direct supervisor. JA292. From the start, Williams felt he was not adequately trained.

2

JA0898–0901. In September 2019, Sonia Aronow ("Aronow") was assigned to assist Williams with transitioning to processing cases in Fairfax County following his request for this guidance. JA300–305, JA360. Aronow testified Williams is the one who requested someone to help and spend time with him because "he didn't feel he had gotten sufficient training or support" and so DeMijango asked Aronow "if that was something [Aronow] could help him with." JA0881, JA0969, JA0973–0974.

Williams quickly observed Fairfax County's case processing was very different from DC. JA294–97. Williams also observed that, unlike in DC, the supervisor-subordinate relationship in Fairfax County dictated that the supervisor is ultimately responsible for all their subordinates' cases. JA334–335, JA359, JA572–573. Williams was responsible for up to 75 cases at a time due to being responsible for his supervisees' cases. JA949. In light of these differences, Williams felt Aronow's guidance would be beneficial after recognizing the difference in protocols between his prior position with DC and Appellee, especially given that his supervisor, DeMijango, was rarely around. JA0826, JA1949–1950. Williams viewed Aronow as his "supervisor" and one of his "points of contact for Fairfax County" and testified this was because DeMijango was largely unavailable during the first part of his employment. *Id.*; JA1879, JA1953. Although Aronow's intended purpose was to "coach" Appellee, she did not provide "coaching" and instead openly disagreed with Williams' assessments while using demeaning and degrading

behavior to, for example, undercut his authority in front of his staff. JA917-918, JA1872-1874, JA1915.

Williams first engaged in protected activity in November 2019 by reporting Aronow's behavior to Oriane Eriksen ("Eriksen"), CYF Division Director. JA1408. During Williams' meeting with Eriksen, Williams expressed concerns about the lack of support he was receiving from DeMijango, and how her approach was undermining his ability to do his job, credibility with his staff, and creating divisions within his unit. JA924-926, JA1893, JA1918, JA2049–2078. Williams also advised Eriksen and DeMijango in November 2019 he felt Aronow's behavior and approach during coaching sessions were demeaning and degrading. *Id.*; JA1922–1924. Not only did Eriksen not acknowledge or investigate Williams' concerns, Eriksen's response completely ignored Williams' complaints, suggesting that instead he needed to "buckle down and accept the help [the County has] given him" which dissuaded Williams from taking that complaint further. JA2049–2078.

Williams again engaged in protected activity on January 16, 2020 following his January 15th meeting with DeMijango to review his mid-year evaluation. JA361, JA670–675. During the January 15th meeting, DeMijango communicated to him that he was on track for a permanent supervisory position with CPS. JA669–675, JA1160–1201. DeMijango's overall mid-year rating of Williams indicated he was "[e]ligible for a performance-based increase if funded." JA669–675. In the review,

DeMijango listed Williams' coaching with Aronow, as well as other development opportunities he pursued, and stated he was making progress toward "*mastering*" his role. *Id.* (emphasis added). DeMijango recognized a number of his strengths, which are core components of his position and key to DFS' mission, and only four areas of development, all administrative tasks. *Id.*

During Williams' final scheduled coaching meeting with Aronow on January 15, 2020, Williams asked her to look over his mid-year evaluation with him. JA319–320. Aronow told Williams he should be more mindful of his environment before discussing his husband because he seemed like the type of person who just wanted to get it out there up front and make people deal with it or not. JA676–680. Williams responded he had a right to talk about his husband because he had a right to be married in this Country and is legally married. *Id.* Aronow continued speaking negatively about Williams' identity and protected class, adding that some people may feel as though he is challenging or testing them and be bothered by it so much so that he may face consequences associated with being openly gay. *Id.* When Williams questioned what Aronow meant by "consequences," Aronow reiterated some people prefer not to share information about their private lives. *Id.* Aronow advised Williams to not share any information about being married to a man with his colleagues because she was aware of several individuals in DFS who were "not okay" with it. JA676–749, JA1130–1159. Aronow also told Williams not to disclose

so freely that he is a gay man and married to another man if he wanted to succeed in the County. *Id.*

On January 16th, one day later, Williams reported Aronow's discriminatory conduct in the January 15th meeting to DeMijango and HR. JA1421-1422. During this same meeting, Williams contends Appellee's HR Generalist, Khamla Kawahara ("Kawahara"), explicitly categorized Aronow's behavior and comment as discriminatory. JA1166–1167. That same day, Kawahara asked Williams not to file an EEOC charge and instead allow the department to handle his complaint during their conversation. JA1130–1159, JA1409; *contra* JA1102–1103. Simultaneously, Kawahara failed to inform Williams of his right to file an OHREP complaint. JA116, JA1042–1043, JA1130–1159, JA1409; *contra* JA1102–1103. These actions were the first in many direct and implied messages to Williams that he should be discouraged from moving forward with his complaints, indicating Appellee was not willing to take them seriously by conducting a thorough, impartial investigation.

Following Appellee's explicit and implicit discouragement from effectuating his discrimination claims, Williams continued to face retaliation. Moreover, Kawahara and Robyn Walden's ("Walden") comments on January 16th and 31st, 2020 showcase Appellee's discontent with Williams' engagement in protected activity. Despite the discouragement, on January 21, 2020, Williams filed his formal HR complaint with supporting documentation. JA676–680, JA1405. Williams was

waiting for a full investigation and interview with Kawahara's supervisor, Walden; it never occurred. JA0882, JA1092–1093. Nor did Appellee conduct a proper in-person interview with his harasser, Aronow. JA1056–1057. Walden testified she could not recall ever meeting with Aronow in-person and there is no record of such an HR meeting with Aronow to discuss remediation or other appropriate actions addressing Aronow's harassment. *Id.*

Appellee never took any action to fully investigate Williams' complaints, interview Aronow in-person, or hold Aronow accountable through training, corrective action, or other appropriate actions. JA1057–1058. Further, Aronow did not complete any required sensitivity or discrimination training, receive a placement on administrative leave, or receive written discipline or other corrective action related to Williams' complaints prior to the expiration of her appointment. *Id.* Appellee did not look into remedial measures until after Aronow's position ended, nearly one month after it had spoken to her. *Id.*

The record reflects Walden and Kawahara lacked the ability, knowledge, and follow through to thoroughly investigate, and appropriately, follow Appellee's harassment processes to prevent continued discrimination, harassment, and retaliation. JA1051–1052. Specifically, Walden testified "we [her and Kawahara] are both trying to do our very best at this so…" implying they did not know what they were doing. JA1048, JA1050–1051. Walden testified she never saw PM 39-06 [the

County Office of Human Rights and Equity Programs' Policy and Procedure on Harassment] until two months after she finished investigating Williams' complaint and issued the January 31, 2020 "Investigation Follow-Up Letter to Complainant" summarizing Appellee's determination, despite "investigating" a violation of that very same policy. JA745, JA1065–1069. The January 31st memorandum with Appellee's conclusion that Williams' discrimination complaint could not be substantiated specifically cited to PM 39-06 on Harassment, raising questions about its propriety given the lack of understanding and application to Appellee's findings. JA746–747.

On January 31, 2020, Williams was called into a meeting with Walden and Kawahara in which Walden informed him she did not believe Aronow's actions were discriminatory, as Aronow had "good intentions." They suggested Williams meet with Aronow so she could explain her intentions to Williams,  further dissuading Williams from voicing his feelings and engaging in further protected activity and ultimately having an effect on the terms and conditions of his employment by forcing him to be around a homophobe. JA327, JA735–736, JA738–739, JA746–747, JA1130–1159, JA1405. This meeting was when Williams first learned his investigation had already been "closed." JA1054. Williams declined meeting with Aronow, as he did not want to meet with his harasser, particularly if Appellee had already summarily reached a decision. JA0940. Based on the lack of remediation

against Aronow, HR's deficient efforts to investigate, and explicit discouragement from Appellee's employees from proceeding with his complaint of discrimination, Williams felt Appellee continued to subject him to retaliation continuing through his May 6, 2020 separation.

Despite the adverse impacts caused by Aronow's pervasive derogatory comments and Appellee's continued retaliation through its failure to carry out effective harassment policies, failure to investigate, and actions to discourage further protected activity, Williams continued to perform his job to the best of his abilities. Williams maintained his satisfactory level of performance without deviation from his positive feedback and mid-year performance ratings. JA669, JA0985–0988. DeMijango testified that as of March 18, 2020, when she signed Williams' mid-year probationary review, it reflected that Williams' performance was exactly as it was in his January 15th review. *Id.* At all times, Williams employed the principles instilled in him and practices he was directed to follow by DeMijango, including focusing on the backlog of cases and closing two-to-three per week. JA0943–0944, JA1111–1113.

Within 13 weeks of Williams' January 16, 2020 complaints and 11 weeks of his January 31, 2020 meeting, Williams was subjected to increased scrutiny through management's inquiries in early April 2020. JA288–291, JA332–333, JA1403–1404, JA1406. DeMijango began to ask him unjustified questions about his cases in

9

early April, which Williams felt nitpicked him. JA288–291, JA332–333. DeMijango said things like, "I don't understand what happened with this case, because it came back around…a month later . . . so what happened with this?" JA290. Williams felt DeMijango was looking closer at his cases in Spring 2020 than his colleagues as retaliation for engaging in protected activity. *Id.*; JA618, JA1000, JA1114–1116, JA1128–1129, JA1301–1304.

Within 11 weeks from the January 31, 2020 meeting, on or about April 16, 2020, Appellee opened an investigation into Williams' cases. JA1401. Shortly thereafter, on April 30th, Appellee abruptly placed Williams on administrative leave, without warning, for purposes of an "investigation" relating to a high-risk referral case. JA1406. This reason was untrue because the investigation had been completed six days prior to Williams being placed on leave. *Id.* Moreover, after DeMijango learned of the referral on April 10, 2020 (a continued situation from something Williams worked on beginning March 12, 2020), it took DeMijango *six days* to bring the issue to her supervisor's (Eriksen) attention. JA1407. Shortly after Appellee placed Williams on leave, and again without warning, on May 6, 2020, Michael Becketts ("Becketts"), DFS' Director, issued Williams an Unsatisfactory Service Separation ("USS") riddled with falsities to further paper his file. JA354–355, JA761–763.

Contrary to suggestions in the USS, Williams properly supervised his supervisees, including running decisions past Aronow and reprimanding his own subordinate for not following protocol. JA1104–1110. The USS falsely stated DeMijango expressed concerns that Williams' performance was not improving in his mid-year probationary review, which is not reflective of his high marks and ratings received. *Compare* JA670–75, *with* JA761–763. DeMijango communicated to Williams that he was on track for a permanent supervisory position with CPS: "Edward has made progress in the areas listed above and appears to be doing a better job at understanding the role and expectations of a CPS Supervisor" and "[o]verall, my assessment is that you meet all of the areas with development opportunities. I do not believe that you rate a 'do not meet' in any of the sections as of today." JA669–675. Critically, there is no evidence any child was harmed – or even placed in imminent danger - by *any* of the alleged deficiencies in Williams' unit's paperwork. JA1409. There is no evidence to suggest Williams' allegedly deficient administrative entries were any different than his colleagues, a comparison Williams was prevented from adequately investigating himself in this case. JA1406. Beyond the information in the USS, Appellee and Williams' supervisor undertook efforts to "corroborate" and strengthen their "legitimate non-discriminatory reasons" by having DeMijango manufacture an entire timeline of events leading to August 2020—three months *after* Williams' wrongful termination. *See* JA661–668.

## B. Procedural History

Pursuant to Virginia Code § 15.2-209, Williams served Appellee with notice of his claims on December 8, 2020. JA104. On or around January 22, 2021, Williams filed a timely Charge of Discrimination (the "Charge") with the EEOC. JA105.[1] On April 28, 2023, after concluding its investigation, the EEOC issued a Notice of Right to Sue. *Id.*

Within 90 days, on July 27th, Williams filed a three-count Complaint in the Eastern District of Virginia. JA010–036. Williams filed an Amended Complaint on November 10th. JA103–132. Ultimately, after engaging in discovery and the case proceeding through the litigation process, on May 9, 2024, Appellee filed a Rule 56(a) motion for summary judgment. JA235. Williams filed his opposition on May 28th, and Appellee filed a reply in further support of its motion on June 3rd. JA1399–1434, JA1444-1465, JA2079–2101. The District Court heard oral arguments on June 7th, wherein it orally granted Appellee's motion and entered judgment in favor of Defendant-Appellee and against Plaintiff-Appellant. JA1466–1468.

---

[1] While Appellee initially challenged the timeliness of Williams' EEOC Charge regarding Aronow, it appears have abandoned that argument at the hearing on its Motion and thus, it failed to preserve the issue for any appellate arguments. *See generally* JA1444-1465, JA1492-1529.

### C. The District Court's Decision

The District Court's final Judgment and Order, issued on June 7, 2024, awarded summary judgment on all claims in favor of Appellee pursuant to Rule 58. JA1467–1468, JA1526–1527. In doing so on summary judgment, the District Court rejected Williams' Title VII sexual orientation discrimination, hostile work environment, and retaliation claims. It held Williams failed to establish his *prima facie* case of discrimination (Count I) because he had not demonstrated Appellee's motivation to remove him based on his sexual orientation and, thus, the discrimination, including Aronow's comments, were not a determining factor in his termination months later. JA1527. On Count II, the Court held Williams failed to meet the severe or pervasive standard under the totality of the circumstances, and his conversations and complaints were indicative of workplace disagreements. JA1527–1528. It rejected Williams' retaliation claim (Count III), finding no causal connection because it was over three months between his conversation with Aronow and the complaints and his termination, which "dampened any temporal evidence of retaliation." JA1528. It added it did not find additional events supporting retaliation. *Id.*

## SUMMARY OF ARGUMENT

The Court erred in granting summary judgment for Appellee by failing to consider key facts and doctrines. On Count III, it failed to consider the first

opportunity doctrine, and that temporal proximity may be mitigated by other relevant facts, including intervening acts and retaliatory animus, to establish causation. On all Counts, the Court improperly put itself in the role of the jury—by, *inter alia*, making credibility determinations and weighing evidence—depriving Appellant of his right to have the case decided by a jury of his peers. Finally, the Court erred by crediting statements made by Appellee's counsel that were unsupported by the record evidence and failing to remedy the discovery abuses preventing Appellant from the opportunity to conduct discovery to determine if there is evidence to refute Appellee's arguments concerning comparator evidence and the casefiles. For these reasons, this Court should reverse the District Court and allow Williams to truly, and fairly, have his day in court.

## ARGUMENT

### I.    STANDARD OF REVIEW

Following an appeal to the Fourth Circuit, the Court must review a district court's summary judgment ruling *de novo*, "applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). "Summary judgment is warranted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A genuine question of material

fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019) (cleaned up). In conducting this inquiry, courts may not "weigh conflicting evidence or make credibility determinations." *Id.* But "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (cleaned up).

When considering an appeal from the non-moving party in the summary judgment proceedings, the Court shall consider the facts, with reasonable inferences drawn, in the light most favorable to the non-movant. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 643 (4th Cir. 2007) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The question at the summary judgment stage is not whether a jury is sure to find a verdict for the plaintiff; it is whether a reasonable jury could *rationally* find so. *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). In considering a motion for summary judgment decision by a district court, the Court of Appeals cannot weigh the evidence or make credibility determinations. *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007) (*citing Anderson*, 477 U.S. at 255); *see also* Fed. R. Civ. P. 56 Advisory Committee Note (1963 Amendment) ("Where an issue as to a material fact cannot be resolved without

observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."). Additionally, the Court must credit evidence contradicting key factual conclusions by the moving party and resolve disputes in favor of the non-movant. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) (*citing Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (2014) (per curiam)) (Supreme Court vacated appeals court's affirmance of district court's grant of summary judgment because appeals court "weigh[ed] the evidence and reach[ed] factual inferences contrary to [the nonmovant's] competent evidence."). "To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001).

As it pertains to analysis of Count III, Title VII prohibits an employer from retaliating against an employee for engaging in protected activity. 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a). A plaintiff can prove his case either "through direct and indirect evidence of retaliatory animus," or through a burden-shifting "pretext" framework. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). In the context of a retaliatory discharge, this means an employee may proceed by showing directly that he was fired in retaliation for protected activity, or by proving that any non-retaliatory justification for the firing was pretextual. The choice is "left

16

to the plaintiff's discretion." *Id.* Under *McDonnell Douglas*, "plaintiff must first establish a *prima facie* case of retaliation by showing: (1) he [] engaged in a protected activity; (2) the employer acted adversely against him []; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers v. City of Laurel*, 895 F.3d 317, 327–28 (4th Cir. 2018) (cleaned up). This initial burden is not meant to be "onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

A plaintiff may attempt to demonstrate a protected activity caused an adverse action through two routes. *Johnson v. United Parcel Serv., Inc.*, 839 Fed.Appx. 781, 782–84 (4th Cir. 2021). A plaintiff may establish the existence of facts that suggest that the adverse action occurred because of the protected activity. *Id.* (*citing Lettieri*, 478 F.3d at 650 (recognizing "relevant evidence may be used to establish causation")). A plaintiff may also establish "the adverse act bears sufficient temporal proximity to the protected activity." *Id.* (*citing Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action. *See id.*

## II.    THE DISTRICT COURT ERRED IN REJECTING WILLIAMS' *PRIMA FACIE* CASE OF RETALIATION BECAUSE THE TEMPORAL PROXIMITY COUPLED WITH THE FIRST OPPORTUNITY DOCTRINE, INTERVENING ACTS, AND EVIDENCE OF RETALIATORY ANIMUS SUPPORTS A CAUSAL CONNECTION SUFFICIENT TO SURVIVE SUMMARY JUDGMENT

Viewing the facts in the light most favorable to Williams, the record supports that a reasonable jury could conclude there is a causal connection sufficient to survive summary judgement. The fundamental problem with the District Court's decision is that it gave immense, yet undeserving, weight to the temporal gap between Williams' protected activity and the adverse employment action—between three and four months— ultimately causing it to find a lack of causation and concluding that there was no evidence of any retaliatory activity. However, the case law does not support placing such great weight on temporal proximity. In fact, the Fourth Circuit case law simply suggests that given a significant temporal gap between protected activity and adverse employment actions, plaintiffs may not rely solely on such proximity in establishing causation. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (explaining "that a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation is too long to establish a causal connection by temporal proximity alone,"). In addition to which, the Fourth Circuit has recently—in the last year— highlighted the importance and value of taking seriously circumstances outside of

temporal proximity in making determinations that preclude a plaintiff from having their day in court. *See Barbour v. Garland*, 105 F.4th 579, 596 (4th Cir. 2024) ("We agree with Barbour that the district court erred in its Dismissal Order by failing to consider 'other evidence of retaliatory animus'...").

Most notably, the Court failed to consider that Williams' termination may have been the first natural decision point in which Appellee's could've retaliated against Williams for his protected activity. In addition, but no less important, the Court failed to give proper weight and consideration to the recurring retaliatory animus during the intervening period, including events that occurred on January 16th, 21st, and 30th, 2020 which, if given their due attention, would support a finding that there remains a genuine issue of material fact with respect to causation.

### A. The Court failed to consider the first opportunity doctrine.

In the Fourth Circuit, even where there is a large gap in time between the protected activity and adverse action, a causal connection may be established where the adverse action came at a "natural decision point . . . making likely" that any retaliatory adverse action would happen at that time, and not at some earlier point. *See King*, 328 F.3d at 151 & n.5 (causal connection established, despite 10-week gap between protected activity and adverse action, where adverse action [discharge based on performance] occurred at point when performance-based discharges would naturally occur); *see also Templeton v. First Tenn. Bank, N.A.*, 424 Fed.Appx. 249,

250 (4th Cir. 2011) (refusal to hire woman who resigned two years earlier because of management's failure to address sex harassment complaints, although remote in time, raised issue of retaliation where refusal to rehire was company's first opportunity to retaliate).

Notably, the Fourth Circuit recently reversed a district court judgement of dismissal in *Barbour v. Garland*, based on its acknowledgement that the district court failed to consider other evidence of retaliatory animus in assessing causation for Appellant's retaliation claim. *Barbour v. Garland*, 105 F. 4th 579, 597 (4th Cir. 2024).  In *Barbour*, Appellant contends that the district court failed to recognize that "the DEA rendered its non-selection decision –and thereby retaliated against her for filing the FBI lawsuit – upon the first opportunity to do so. *Id*. at 595-96; *Reardon v. Herring*, 201 F.Supp.3d 782 (E.D. Va. 2016) (recognizing that adverse action taken at the first convenient opportunity, among other circumstances, supports an inference of retaliation.) Moreover, with respect to the first opportunity doctrine, Appellant "explains that the decision-making authority rested with the DEA hiring panel, and therefore 'the hiring panel stage presented the DEA's first chance to reject her application." Further, Appellant emphasizes that "'once the hiring panel got hold of [her] application,' it 'appointed new background investigator, attempted to find fault with [her] previously cleared background check, and soon thereafter, [rendered its non-selection decision]." Ultimately, the Court agreed with Plaintiff that the

Complaint adequately alleges retaliation at the first opportunity and taken together with the recurring retaliatory animus and other circumstances, a plausible inference of retaliation may be made. Here, there is a genuine dispute as to whether Williams' protected activity was the cause of his termination. While Appellee had knowledge of Williams' protected activity for some time before taking adverse employment actions against him, the April incident was the first "natural point" or real opportunity to take such retaliatory action. Like the fault-finding investigation carried out by the employer in *Barbour*, Appellees engaged in a similar unwarranted "fault-finding" investigation, using the April incident as a guise for their retaliatory efforts. Further, the April incident sparked a rather aggressive investigation into Williams' casefiles given the fact that Williams' performance had never previously been called into question. Therefore, the Court may comfortably draw the inference that the April incident and subsequent investigation, and ultimately Williams' termination, was retaliatory. Importantly, it was not for the District Court to determine whether it was *more plausible* that the investigation into Williams' case files was genuinely a result of Appellee's concern regarding Williams' performance, rather the Court's role on the motion for summary judgment was to determine whether a jury could reasonably find for the plaintiff based on the evidence presented. In recognizing that the April incident was the first opportunity that Appellee could retaliate against Williams, and that the subsequent investigation

ultimately led to his termination, this Court may properly find that the District Court erred in granting Appellee's motion for summary judgement.

Further, the District Court improperly determined that a reasonable jury could not find that Williams' termination was an adverse employment action taken in retaliation for his protected activity. In viewing the evidence in the light most favorable to Williams' and drawing all reasonable inferences in his favor, this Court may find that there is in fact a genuine issue of material fact. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d at 249.

### B. Williams established causal connection through intervening retaliatory acts, failures in the investigatory process, and circumstances surrounding termination supporting inference of retaliation.

An adverse action that bears sufficient temporal proximity to a protected activity may, along with the existence of other facts, suggest that the adverse employment action occurred because of the protected activity. *See Johnson v. United Parcel Serv., Inc.*, 839 Fed.Appx. 781, 783–84 (4th Cir. 2021) (*citing Lettieri*, 478 F.3d at 650 (employer's post-complaint retaliatory conduct prior to termination may be used to establish causation where temporal proximity is lacking)); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (absent other facts, temporal proximity between employer's knowledge of protected activity and adverse employment action must be "very close" to establish causation prong). The Fourth Circuit, in *Lettieri*, has firmly established that "[i]n cases where temporal proximity

between protected activity and allegedly retaliatory conduct is missing . . . evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." 478 F.3d at 650 (cleaned up). Further, the Court held that the additional "intervening events—which occurred regularly after Lettieri's complaint and can reasonably be viewed as exhibiting retaliatory animus on the part" of her supervisors—were "sufficient to show a causal link between Lettieri's complaint and her termination[,]" despite the six-month gap between the two events. *Id.*

Accepting Williams' testimony as true and resolving all disputes in his favor as the non-movant on summary judgment, Williams established causation by pointing to continuing retaliatory conduct and animus directed at him by Appellee in the three-month period between his complaint and USS.

> ### i.    HR comments discouraging Williams from moving forward with his complaints and other intervening acts support an inference of retaliation.

Williams' showing that, on numerous occasions, HR representatives pressured him into dropping his complaint, not only establishes a violation of Title VII on its face but also shows distinct support for his claim of retaliation. HR discouragement is just one of many examples illustrating Appellee's "recurring retaliatory animus during the intervening period" between the protected activity and the adverse employment actions, which supports a finding of causation. Specifically,  Williams

23

established that on both January 16th and 31st, HR representatives pressured him to drop his complaints. *See* JA1130–1159, JA1409. The retaliatory animus rings particularly true where Walden and Kawahara failed to fairly and thoroughly investigate and implement Appellee's anti-discrimination policies in the workplace as HR representatives.[2] Further, HR representatives' involvement in internal investigation and discipline reinforces the importance of giving due weight to evidence demonstrating HR's dissatisfaction with Williams' protected actions.

 HR's dissatisfaction with Williams' engagement in protected activity is evident after examining the timeline of events after January 21st when he filed a formal complaint.

---

[2] Notably, Walden and Kawahara did not even know how to apply the anti-discrimination policies, justifying this by testifying, "we [Walden and Kawahara] are both trying to do our very best at this so…" *See* JA1048. The County's memorandum closing the investigation into Aronow's comments, with no further action, defines discrimination by citing the EEOC: "[A]ny act or failure to act, impermissibly based in whole or in part on a person's race, color, religion, sex, national origin, age, physical or mental handicap, and/or reprisal, that adversely affects privileges, benefits, working conditions, resulting in disparate treatment, or had a disparate impact on employees or applicants." *See* JA746-747. Despite this, HR based its determination that discrimination was unsubstantiated on grounds that "it doesn't rise to the level of severe or pervasive[.]" JA2110. "Severe or pervasive" is not an element of discrimination. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Walden testified that, rather than follow County policies, procedures, or regulations, they "had accessed a folder of conducting effective investigations to put this type of document together, and it was a training folder that I had brought with me [*i.e.*, from Walden's former job]. DFS did not have any type of close-out letter like this, nor had they created a formal investigation protocol[,] [...] talking points or, [] how to take notes and sign off on notes when you're conducting an investigation." *See* JA1051-1052.

Between Williams' meeting with Kawahara on January 16th, filing of his formal complaint on January 21st, and meeting with HR for a mere 15 minutes on January 31st (wherein HR informed him its investigation was "closed" and it found no discrimination had occurred), Aronow unexpectedly popped into Walden's office for a one-hour meeting. JA1039-1040, JA1403–1404. Then, immediately following his complaint and after Aronow left, Williams was subjected to increased scrutiny. *See, e.g.*, JA1406, ¶ 60. In late-February/early-March 2020, DeMijango began nitpicking Williams; however, at the time, he did not understand why. JA247, ¶ 50; 889. Appellee launched a baseless witch hunt investigation into Williams' cases in April 2020. JA889-892. In early April, DeMijango began "looking and asking about cases and nitpicking." *See* JA889, JA1406, ¶ 50. She began incessantly questioning Williams (as Aronow had done), creating arbitrary deadlines, and spot-checking his cases and memory of the same with zero notice to allow him to prepare (while his colleagues told him they all received notice if she ever checked their cases). *See* JA889-891. On April 30th, Williams was placed on administrative leave with zero warning. JA1123–1124. While Appellee later claimed the leave was for it to conduct an investigation into Williams' cases, this was false: the investigation had been completed *six days prior* to Williams being placed on leave. JA1122. By 10:03PM that same night—April 30th—HR had circulated version 2 of its proposed USS. *Id.* Williams was never given a chance to rebut the investigation or review the casefiles–

25

–he was placed on leave while Appellee finished crafting its USS and weaving its careful web. *Id.*; JA1407–1408, ¶ 76. On May 6th, he was given the USS, riddled with falsities to further paper his file, and he was terminated. JA761-763. Thus, just like in *Lettieri*, regularly occurring intervening events between Williams' complaint and termination occurred to make it easier for Appellee to terminate him. 478 F.3d at 650–51; JA1119–1122.

> ### ii.     *Appellee's failure to investigate or remediate Williams' complaints supports an inference of retaliatory animus.*

It is undisputed Williams asserts Appellee failed to adequately investigate his complaints, interview Aronow in-person, remediate Aronow, or follow-up sufficiently with Williams before closing out its brief and superficial investigation. JA1403–1404. Following Wiliams' January 16th meeting with Kawahara, Kawahara recounted the same to Walden; that same day, the two briefly called Aronow. *See* JA1037-1038. After that call, Walden—immediately and before any investigation could possibly have begun—determined no further investigation was necessary. *Id.* Then, on January 21st, Aronow unexpectedly popped into Walden's office for a one-hour meeting; again, Walden still felt no further investigation was necessary. *See* JA1038-1039. On January 30th, Williams was invited to meet with Walden and Kawahara to "discuss" his complaint. *See* JA1054. The next day—January 31st— they met for 15 minutes, during which time Walden gave Williams a memorandum indicating his complaint was found to be unsubstantiated and the matter had been

"closed." *Id*. At no time between January 16th and 31st did HR *ever* speak to Williams or even provide him with notice of his rights and protections against retaliation. *See* JA1039-1040, JA105310-54. Rather, on January 16th, Kawahara asked Williams not to file a charge with the EEOC. JA1409, ¶ 8. Perhaps even more troubling is the fact that, despite Williams' initial verbal complaint, formal written complaint, and Aronow's admission of the exact statements Williams complained of, HR interviewed Aronow *twice* and took a detailed written statement from her. JA1416. However it never once interviewed Williams, which is why he felt compelled to submit his formal written complaint—he had heard crickets for nearly one whole week after complaining to Kawahara about serious issues. Moreover, Walden admitted it is her practice to interview complainants, yet she chose not to interview this complainant. JA1416.

The evidence further supports that the HR personnel conducting the investigation were not even aware of the policies within Appellee's own harassment memorandums, testifying they had not read or reviewed the memorandum as of the issuance of the January 31, 2020 findings. JA1405. Appellee was also required to report Wiliams' complaint and the outcome of the investigation into the same to OHREP: "Department directors shall report all complaints of harassment, discrimination, or retaliation occurring within their departments immediately upon receipt of the complaint to OHREP and also shall report the outcome of the

department's investigation and a copy of the investigation to OHREP." *See* JA1253. It failed to report either to OHREP. *See* JA1034-1035, JA1045-1046, JA1065-1068 (showing County did not follow protocol, nor was aware of it); *compare* JA1255-1272 (what County did submit to OHREP as investigative file), *with* JA1273-1297 (actual investigative file).

These occurrences, which began following Williams' complaint and continued through Williams' USS, are sufficient to support an inference of retaliation based on reprisal for protected activity. Viewed collectively with the temporal proximity of three months between the complaint and termination, comments discouraging protected activity, and substantive inaccuracies surrounding Williams' termination, this evidence is sufficient to establish causation. The Fourth Circuit has determined that an employer's failure to adequately investigate an employee's complaints is enough to raise an inference of discrimination, not rebut proffered legitimate reasons for employment actions. *See Dawson v. Wash. Gas Light Co.*, No. 1:18-cv-971, 2019 U.S. Dist. LEXIS 155322, at *25–26 (E.D. Va. Sept. 9, 2019) (*citing Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 212–13 (4th Cir. 2014) (employer's failure to investigate claims of harassment must implicate proffered legitimate reason for adverse action to be evidence of pretext)).

To the extent Appellee may argue it *did* remediate Aronow through her term appointment conveniently "expiring," this is insufficient to support Appellee took

appropriate and prompt remedial action, as required. *See E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 669 (4th Cir. 2011) (in assessing reasonableness of employer's response, courts consider, *inter alia*, "the promptness of [] employer's investigation when complaints are made, whether offending employees were counseled or disciplined [], and whether [] employer's response was actually effective."). Appellee cannot say it took prompt action. By its own admission, Aronow was set to retire just *17 days* after she made her discriminatory comments to Williams, and she retired a little over a month later, on February 28th. JA246, ¶ 48. Aronow testified she did not complete *any* required sensitivity or discrimination training at any time before her appointment expired, receive a placement on administrative leave, or receive written discipline or other corrective action related to Williams' complaints prior to her appointment "expiring." JA1057–1058. Appellee did not explore remedial measures until *after* Aronow's position ended, nearly one month after it had conveyed its findings to her. *Id. Williams* was the one who canceled further meetings with Aronow, not Appellee. JA1416–1417. HR wanted him to have a sit down with Aronow to "clear the air" and to allow Aronow to "explain herself," but Williams understandably refused. JA1417. At no time did Appellee encourage earlier separation; rather, it was Aronow herself who ultimately separated from Appellee because she felt "their need for me was diminishing," so she told DeMijango and Slappey they "had some good people on board. You don't really need me for this, if

you want me to do something specific, I'd be glad to do it, but you don't have to make up jobs for me." *See* JA969. Appellee would have let Aronow remain a County employee even longer if she did not pull the plug, and it did nothing to cut short her time left through the end of February 2020, allowing her to receive her full compensation. *Id.*

In *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999), the Court noted that "[j]ust as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care." *Sheahan* affirms that an employer's inadequate response does not defeat liability if, by mere coincidence, the harassment stops, and contemplates the response's adequacy, not its motivation. *Id.* Based on this, the fact that Aronow's term appointment happened to expire, with no affirmative action taken by Appellee leadership or HR, does *not* support a conclusion that it adequately investigated or remediated as required by its harassment policies.

In light of Appellee's shortcomings in investigating and appropriately responding to Williams' complaints of pervasive, derogatory comments about his sexual orientation and ability to be open at work, Appellee actually subjected Williams to continued, regular retaliation. Appellee's actions left Williams vulnerable, without closure, and without any guarantee of protection from continued harassment and sexual orientation-based attacks. JA1417. Appellee's failures,

30

coupled with the timeframe, discouragement of following through on complaints, and inconsistencies in its reasons, all support a finding of causal connection for purposes of summary judgment.

>    ### iii.    *Williams' increased case scrutiny and circumstances surrounding April 2020 investigation and May 6, 2020 termination cast doubt on legitimacy and support an inference of retaliatory animus stemming from intervening acts.*

Applying the Circuit's holding in *Lettieri*, here, this supports looking at all evidence supporting pretext to also support a finding of causal connection, even where approximately three months passed between Williams' complaints and his termination. 478 F.3d at 650. Therefore, Williams hereby incorporates by reference his section supporting why Becketts and Appellee's termination was pretext for retaliation, *supra.*

Assuming all inferences in Williams' favor as the non-movant, he established that all records and ratings demonstrated a highly satisfactory performance level until after his discrimination complaints in January 2020. JA669-675. Williams has demonstrated, for purposes of summary judgment, that Appellee included several false statements in his May 6th USS, which could allow a reasonable juror to conclude the termination was issued entirely, or in the absence of less severe options, based on retaliatory motivations. This includes, *inter alia*, misstating Williams' overall ranking, future at Appellee, and need for guidance from Aronow. *Compare*

JA669–675, *with* JA761–763; JA1186–1190, JA1425–1428, JA2076–2077 (detailing inaccuracies). Furthermore, the record reflects Appellee attempted to further "trump up" its allegedly legitimate non-discriminatory reasons in August 2020 by having DeMijango manufacture an entire timeline of events leading to the April 2020 investigation, more than three months after Williams' wrongful termination. *See* JA661–668, JA1769–1776.

Williams sufficiently established a causal connection between his protected activity and termination to support *prima facie* retaliation at the summary judgment stage. For these reasons, Appellant requests this Court reverse and vacate the District Court's grant of summary judgment on Count III.

### III. THE DISTRICT COURT ERRED BY FAILING TO CREDIT WILLIAMS' MATERIAL DISPUTES OF FACT THAT CONTRADICTED APPELLEE'S KEY FACTUAL CONCLUSIONS, IMPROPERLY WEIGHED THE EVIDENCE, AND RESOLVED DISPUTED ISSUES IN FAVOR OF THE MOVING PARTY

To the extent the Court credited Appellee's facts in its reconciliation of the disputes, this was improper and should not be affirmed in support of upholding its summary judgment decision. Instead, this Court is required to credit and resolve all disputes in favor of Williams, including all key denials and disputes raising inferences of pretext and retaliation due to Williams' denials of inaccurate reasons supporting his termination. The question on summary judgment is not whether a jury

is sure to find a verdict for plaintiff; it is whether a reasonable jury could rationally find so. *Spillman*, 925 F.2d at 95.

"[C]ourts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue…." *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987). "[T]he determination of an employer's state of mind[] … is necessarily fact intensive." *Id.* (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). It is not the court's role to determine the subjective intent of decision makers. *Id.* It is also not its role to weigh evidence or make credibility determinations when confronted with multiple possible explanations for behavior. *Foster*, 787 F.3d at 248, 250 (explaining plaintiff can prove causation for *prima facie* case even without direct evidence of retaliatory animus "[i]f plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination."). Further, federal courts have long recognized:

> [w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.

Fed. R. Civ. P. 56 Advisory Committee Note (1963 Amendments); *Watson v. S. R. Co.*, 420 F.Supp. 483 (D.S.C. 1975), *aff'd*, 542 F.2d 1170(4th Cir. 1976) ("Rule

56…should be cautiously invoked so that no person will be improperly deprived of trial of disputed factual issues.").

Under *McDonnell Douglas*, employers are required to submit "admissible evidence" of proffered explanations. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981) ("the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection"). In other words, in all cases, one or more defense witnesses have testified under oath, via deposition or affidavit, in support of the employer's proffered explanation, but some percentage of those explanations are untrue; however, determining which witnesses' testimony to believe is not the proper role for a trial court deciding summary judgment. This is so because almost every employer facing pretext evidence would claim to have an "honest belief" in its original explanation. There is no special deference to interested witnesses (here, all of Appellee's employees and Aronow) testifying as to their own state of mind. The Supreme Court has explained that, even when all other material facts are undisputed, the question of motivation is itself a fact which requires deciding which inference to draw from those facts. *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) ("The District Court nevertheless was only partially correct in stating that the material facts before it were uncontroverted. The legislature's motivation is itself a factual question."). A manager whose actions have been challenged as unlawful is an interested witness, and a jury need not believe her testimony as to

what her state of mind was at the time of a decision. The Supreme Court has

emphasized that testimony of interested witnesses is not entitled to deference:

> [T]he court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe.* That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (emphasis

added) (internal citations omitted); *see generally Tolan v. Cotton*, 134 S. Ct. 1861

(2014) (summary judgment not proper if based on crediting one side's witnesses

over the other).

In the seemingly routine summary judgment case of *Tolan*, the Supreme Court

granted cert. because the lower court "fail[ed] to credit evidence that contradicted

some of its key factual conclusions" and "improperly 'weighed the evidence' and

resolved disputed issues in favor of the moving party." 572 U.S. 650, 658 (2014)

(cleaned up) (*quoting Anderson*, 477 U.S. at 249). Because the lower court

"weigh[ed] the evidence and reach[ed] factual inferences contrary to [the

nonmovant's] competent evidence," the Supreme Court vacated the Court's

affirmance of the district court's grant of summary judgment. *Id.* at 660; *see also*

*Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is not our job to weigh the

evidence ... or to disregard stories that seem hard to believe. Those tasks are for the

jury.") (citation omitted). Ultimately, the *Tolan* Court held:

> Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion. . . . [¶] The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system.

134 S. Ct. at 1867–68.  One year after *Tolan*, this Court applied *Tolan* to reverse a summary judgment decision in a discrimination case—*Jacobs*, 780 F.3d 562. In *Jacobs*, the Court, in reversing summary judgment, held:

> Strikingly, both of the district court's key factual findings — that Jacobs was not disabled and that Tucker did not learn of Jacobs's accommodation request prior to terminating her — rest on factual inferences contrary to Jacobs's competent evidence. The district court thus improperly resolved factual issues at the summary judgment stage, in contravention of well-settled law.

*Id.* at 569.

Relatedly, this Court recently articulated that if a plaintiff presents evidence that the reasons for termination are inconsistent over time, false, or based on mistakes of fact, summary judgment should not be found in favor of the moving party. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). Likewise, "[e]vidence of repeated complaints to supervisors and managers creates a triable issue as to whether the employer had notice of [] harassment." *Amaré v. Lazer Spot, Inc.*, No. 5:22-cv-00005, 2024 U.S. Dist. LEXIS 84844, at *18–19 (W.D. Va. May 9, 2024).

36

**A. The Court improperly engaged in functions solely in the jury's province.**

The Court erred by failing to recognize there was some evidence to support both sides' stories, whereby making this a case for the jury like in *Tolan* and *Jacobs*. Instead, the Court drew inferences *only* in favor of Appellee, directly at odds with the standard that *all* inferences must be drawn in favor of the non-movant. *See Anderson*, *supra*.

A key element to Williams succeeding on his claims is establishing pretext to rebut Appellee's alleged legitimate reasons for the adverse actions. *Reeves*, 530 U.S. at 143. To establish pretext, he must present evidence to allow a reasonable juror to find (1) the legitimate, nondiscriminatory reasons were "unworthy of credence" and (2) unlawful discrimination was the actual motive for the decision. *Id.* For the reasons outlined herein, "the record in this case requires the weighing of evidence and the drawing of legitimate inferences from the facts to determine whether the claimed harassment was severe or pervasive, what knowledge [Appellee] had about it, and if [Appellee] took reasonable steps to end it." *Amaré*, 2024 U.S. Dist. LEXIS 84844, at *22.

Here, the factual disputes were genuine because Williams' "evidence was such that a reasonable jury could return a verdict for [him.]" *Anderson*, *supra*. Here, summary judgment was inappropriate as it is the jury's role to determine intent and weigh evidence in the face of competing justifications. *Foster*, 787 F.3d at 248;

*Ballinger*, 815 F.2d at 1005; JA1417, JA1508–1509, JA1513–1514, JA1516. Rather than recognizing Williams had marshaled evidence exposing flaws in Appellee's explanations, the Court engaged in inappropriate weighing of the evidence and decided, in a conclusory nature, no reasonable jury would believe his version of events. The erroneous summary judgment ruling was a product of motive determinations and turned on Appellee's credibility. *See supra*. However, an employer's explanation may be true and still be a pretext for discrimination or retaliation. This is a jury question. Critically, here, Appellee's proffered reasons for Williams' termination were belied by its own records, discovery, and deposition testimony, and disputed by genuine evidence, leaving the adverse inference of animus discussed *supra*, in place, subject to a fact finder's determination of Appellee's true motivation.

Here, Appellee's alleged reasons for terminating Williams are mere pretext as the record indicates that Williams was performing his duties to a satisfactory level. Williams was not forced to accept additional assistance in completing his duties but rather sought out additional help and information to better be able to supervise his subordinates and complete his duties in compliance with Appellee's standards. *See See* JA969-970, JA973-974, JA909. His initiative was reflected in his six-month performance evaluation where he met the standards set out for him and did not have a single category in which he did not meet expectations. *See* JA669-675. Upon the

conclusion of the investigation into Williams' casefiles, Williams was not allowed to rebut the allegations against him, learn which cases he had supposedly not adequately supervised, and he was terminated without an opportunity to explain or otherwise address any supposed issues  his performance. *See, e.g.*, JA1840-1848. Thus, Appellee's reasoning regarding Williams' termination is mere pretext as the investigation and termination only occurred upon his report of Aronow's discriminatory statements, Appellee's determination that those statements were not discriminatory even though they contained a veiled threat that he would face the consequences if he continued to disclose his sexual orientation—a threat that ultimately came to fruition.

What is more, once Williams filed his Grievance, Kawahara was on the Grievance response team, despite that she was an interested party intimately involved in the sham HR investigation; this should have warranted a negative inference for Appellee. *See* JA676-685, JA1081-1090. No evidence had been provided by Appellee that Williams put children's lives in danger; he did not. *See infra*. Accepting Williams' testimony as true for purposes of summary judgment, the USS was riddled with inaccurate representations and misstated facts. *See* JA1130-1159 (providing a detailed listing in bullets of the inaccuracies). In reality, the record supports that several allegations within the USS were not accurate nor reflective of a fair review of Williams' administrative files or investigative efforts. *Compare*

39

JA761-763 *with* JA1130-1159. The substantial evidence supporting Williams' prior satisfactory performance reviews, coupled with significant inaccuracies and exaggerated negative reflections on Williams' work performance fail to support his termination was "legitimate". While it is clear the parties possess a different stance on Williams' performance, the determination as to whether his May 6th termination was factually distinguishable, separate, and justified as opposed to the well-planned culmination of Appellee's decision to terminate Williams by any means necessary is a factual dispute appropriate for decision at trial. Therefore, a reasonable jury could find in favor of Williams and Appellee was not entitled to summary judgment.

**B. Discovery practices and abuses made summary judgment inappropriate.**

Summary judgment was inappropriate given Appellee's improper discovery practices. *See* JA1406, JA1421, JA1517. Rule 56(f) allows for judgment independent of the motion in cases where discovery abuses render summary judgment unfair. "Summary judgment must be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 250). Further, making use of discoverable information in one's motion for summary judgement, after denying the other party such information, regardless of the other party's lack of due diligence, provides cause to deny the motion and reopen discovery. 2018 U.S. Dist. LEXIS 37019, at

*6. Reopening discovery is especially important in circumstances where the evidence sought is crucial to the opposing party's claim or defense. *Thomas v. City of Annapolis*, No. BPG-16-3823, 2018 U.S. Dist. LEXIS 37019, at *7 (D. Md. Mar. 6, 2018). Without such crucial information, the opposing party is deprived of any opportunity to question deponents about the relevant evidence. *Id.*

At the final pretrial conference, JA213, Appellant's counsel informed the Court there were still outstanding discovery issues because depositions had just finished that week. At depositions, issues were flagged, but Appellee's counsel refused to discuss them or provide requests documents backing up key arguments it then made on summary judgment. *See, e.g.*, JA0903–0904. Numerous documents, including Exhibits J–Q and AA–EE to Appellant's Opposition brief and Exhibit 38 to Appellee's Motion were not produced *after* the close of discovery in May 2024, despite that they were first requested on December 29, 2023. JA1400.

On summary judgment, Williams objected to Appellee's SUMF, in both his Opposition and at oral arguments, because he did "not have the underlying casefiles to rebut the[] statements despite that these files would have been responsive to his discovery requests" and yet, at oral argument, Appellee relied on those exact casefiles. *See, e.g.*, JA1406–1407, JA1501–1504, JA1512, JA1517. At DeMijango's deposition, Appellee's counsel said he "can't imagine" the protective order form the high-risk case was in the documents it produced, further stating DFS "might and

they might not" have a copy of it, but that he "ha[d]n't seen it[.]" *See* JA1636.

Likewise disingenuously asserted in its Reply that "[p]erhaps the most glaring

omission from the Opposition is any legitimate response or explanation for why an

audit of his case files found" the results it allegedly did and that Williams "simply

mislabels the review of his work performance… as a 'witch hunt,' 'sham,' 'baseless,'

and 'fake,' despite having no evidentiary basis to do so." *See* JA2081. It was

impossible for Williams to form a "legitimate response or explanation" for files he

was never given the chance to see or rebut in April or May 2020 prior to being placed

on leave or terminated, and then was never provided four years later, in discovery,

in 2024. It is absurd for Appellee to improperly withhold relevant and requested

evidence and to then use that "evidentiary basis" for its own one-sided gain. What is

more absurd, is for Appellee to repeatedly misrepresent the same to the tribunal,

whether outrightly in its briefs or via omission by glossing over or failing to address

the same in the briefs or at oral arguments. *See, e.g.*, JA2088.

　　In addition to the casefiles, "[t]he evidence concerning alleged comparators is

at the heart of the plaintiff's claims and is essential, not just at trial, but at the

summary judgment phase of this case." *Thomas*, 2018 U.S. Dist. LEXIS 37019, at

*7 ("plaintiff's case is premised upon the existence of comparators, but he has no

evidence regarding comparators because defendants did not produce such evidence

while discovery was ongoing."). Williams objected to this withholding of

comparator evidence both in his Opposition and at oral arguments. *See* JA1421, JA1427, JA1513. Moreover, Williams has given more than adequate notice of his issue regarding the discovery of several pieces of key evidence.

Appellee's Motion disingenuously asserted that Williams failed to establish an inference of discrimination because "no such comparator evidence has been adduced in this case." It is also misleading given that this resulted from Appellee's counsel's consistent and obstructive efforts to avoid producing comparator evidence through written discovery, document productions, and the deposition process. *See, e.g.*, JA1003-1020, JA1208, JA1210-1211, JA1219-1220, JA1222-1230. Williams tried to obtain comparator evidence regarding how Appellee handled other employees with issues during their probationary periods. *See id*. However, Appellee refused to produce or provide Williams with the comparator evidence sought, including during depositions. *See* JA1210-1211. Instead, Appellee merely produced *one single document* of comparator evidence in discovery. *See* JA1219-1220, JA1094-1100. This lack of good-faith cooperation warranted an adverse inference against Appellee regarding the existence of similarly-situated employees outside of Williams' protected class, who had similar performance shortcomings but were not issued any discipline (up to and including termination) such as him.

Granting the motion for summary judgement deprived Appellant of his right to counteract the prejudicial effect of Appellee withholding discoverable information

which was both relevant and responsive. *See, e.g.*, *Ryan v. Wolf*, No. ELH-19-1968, 2021 U.S. Dist. LEXIS 22759, at *21 (Feb. 5, 2021) (explaining summary judgment was premature when Title VII claims require plaintiff to show "she was fired because of discriminatory reasons," and "such evidence was within the control of" the employer/moving party). Had Appellant been permitted to go to trial, he would have moved for an adverse inference based on Appellee's failure to produce comparator evidence; motions *in limine* were not due prior to summary judgment. JA214, JA1513. However, given that this opportunity was taken away from Appellant by the Court granting Appellee's Motion, Williams was not given the chance.

## IV. WILLIAMS ESTABLISHED DISPUTED ISSUES OF MATERIAL FACT ON WHETHER HIS TERMINATION WAS PRETEXTUAL SUFFICIENT TO SURVIVE SUMMARY JUDGMENT

The Court did not provide analysis beyond finding Williams did not establish his *prima facie* case of Title VII retaliation due to failing to support a causal connection. However, the record on appeal supports a denial of summary judgment on retaliation because Williams met his burden of demonstrating a genuine dispute of material fact on the question of pretext sufficient to make Appellee's proffered justification a triable issue. *See King v. Rumsfeld*, 328 F.3d 145, 154 (4th Cir. 2003) (Gregory, J., dissenting) ("To survive summary judgment, however, King need not squarely rebut his employer's explanation. Instead, King must cast sufficient doubt

upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing.").

To establish pretext, plaintiff must present evidence to allow a reasonable juror to find (1) the legitimate, nondiscriminatory reasons were "unworthy of credence" and (2) unlawful discrimination was the actual motive for the decision, *id.*, which can be done by showing the "proffered nondiscriminatory reasons for termination are inconsistent over time, false, or based on mistakes of fact." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021); *see also Washington v. City of Charlotte*, 219 Fed.Appx. 273, 279 (4th Cir. 2007) (unpublished) (Gregory, J., dissenting) (*quoting Reeves*, 530 U.S. at 147) (in appropriate circumstances, trier of fact can reasonably infer from falsity of explanation that employer is dissembling to cover up a discriminatory purpose). "'[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Id.* at 279–80 (*quoting Reeves*, 530 U.S. at 147). Once plaintiff offers such circumstantial evidence, a case must be decided by a jury and cannot be resolved on summary judgment. *Sempowich*, 19 F.4th at 652.

At the outset, while Williams acknowledges Appellee would have a legitimate reason and requirement to investigate perceived shortcomings in the handling of a

45

high-risk referral, Appellee's overall handling and approach of this situation, including whether the results in fact supported the severe action of termination, are disputed by Williams. The impetus for the investigation remains questionable because it took six days for the matter to be referred by DeMijango despite supposed "dire" circumstances, and then resulted in Williams being placed on administrative leave after the investigation had already been completed six days prior, demonstrating a practice of providing false reasoning. Most critically, Williams asserts Appellee lacks legitimate reasons for its action to terminate him because, based on his history of performance, he should not have been fired—he should have been counseled or given the opportunity to improve if there were issues. The record indicates that many allegations within Williams' USS were inaccurate and indicated an incomplete, slanted review of his casefiles or supervision of his staff, demonstrating Appellee's justification for termination was pretext. *Compare* JA761–763, *with* JA2050–2078. However, without the actual files or any information on, comparators from the County, as explained *supra*, Williams is unable to fairly rebut these facts.

Williams set forth sufficient facts to support circumstantial evidence of pretext and establish material disputes regarding inaccurate information included in the USS, including in an attempt to paint his nearly ten months of exemplary employment as an increasing failure. JA1403, JA1407–1408. Williams also set forth

sufficient evidence to support that the April 2020 investigation into his casefiles, which had posed no previous issues and gained him exemplary reviews for over eight months, was subterfuge for retaliatory animus because, to this day, no one except (maybe) Appellee itself, and not even its counsel, has seen these files. *See supra.* Further, Appellee's desire to get Williams out of DFS became crystal clear when Williams was terminated despite a stellar performance record his first eight months through at least March 2020. This is sufficient to create a triable issue of material fact.

Finally, Appellee's anticipated claims that personnel lacking direct knowledge or involvement in Williams' protected activity or subsequent investigation made the decision to terminate (*e.g.*, Becketts) and therefore could not have been pretextual are red herrings. It is undisputed DeMijango had knowledge of Williams' complaints, as did high-up HR personnel. *See supra*. DeMijango allegedly initiated the investigation into Williams' casefiles, albeit six days after first learning of the "urgent" high-risk referral and perceived failures by Williams. *See* JA1122. Based on DeMijango's involvement, coupled with Williams' disputes on the legitimacy of Williams' performance failures cited in his USS and history of satisfactory performance, Williams set forth sufficient evidence to question the validity of termination. *See Guessous v. Fairview Prop. Invs.*, *LLC*, 828 F.3d 208, 217–19 (4th Cir. 2016) (reversing district court's decision and vacating order of summary

judgment with respect to retaliation claim where plaintiff set forth evidence suggesting persons with knowledge of her protected activity had some involvement in termination, and plaintiff cast doubt upon real motivations behind treatment). In *Guessous*, the Fourth Circuit found the involvement of a manager with knowledge of protected activity and challenges to the employer's legitimate reasons of lack of work were sufficient to survive summary judgment on retaliation. *Id.*

## V. THE EVIDENCE SUPPORTS DEMIJANGO INFLUENCED TERMINATION PROCESS AND DECISION-MAKERS HAD KNOWLEDGE OF WILLIAMS' COMPLAINTS UNDER A CAT'S PAW THEORY

In support of Williams' Title VII claims, the record reflects that Aronow had sway over DeMijango, who, in turn, had sway over Eriksen, who had sway over Becketts, as their direct reports. *See, e.g.*, JA355, JA1542. If a "plaintiff fails to establish a Title VII claim by direct evidence or the *McDonnell Douglas* test, []he may still prevail under the cat's paw theory of liability." *Ashanti v. City of Richmond Sch. Bd.*, No. 3:21cv494, 2023 U.S. Dist. LEXIS 16007, at *22 (E.D. Va. Jan. 30, 2023). Even if this Court were to conclude a lack of evidence regarding Becketts' direct knowledge or notification of Williams' complaints, knowledge may be imputed under a "cat's paw" theory. In Title VII cases, a cat's paw theory of liability contemplates "circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who

48

influenced, but did not make, the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011); *see Ashanti*, 2023 U.S. Dist. LEXIS 16007, at *22.

Here, Eriksen did not conduct her own independent reviews; she rubber stamped those done by Slappey and DeMijango and passed them along to Becketts, recommending termination. JA1766–1768. Becketts stated his "decision to separate Williams was based solely upon [his] determination, upon reviewing information provided by DFS staff, including Eriksen, DeMijango, and Slappey[.]" JA355. In other words, Becketts did not make an "independent decision[:]" he merely rubberstamped Eriksen, DeMijango, and Slappey's decision, which came in part from Aronow's recommendations to DeMijango. *See Ashanti*, 2023 U.S. Dist. LEXIS 16007, at *22–23; *see* JA0963, JA0969–0970.

## CONCLUSION

For the reasons set forth above, this Court should reverse the decision of the District Court.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument in this appeal. The issues presented by this case are important and oral argument will likely be beneficial for the Court.

SUBMITTED BY:

/s/ Roya Vasseghi
Roya Vasseghi
VASSEGHI LAW GROUP
9663-D Main Street
Fairfax, VA 22031
(703) 215-9358 Tel.
(703) 563-7401 Fax
roya@vasseghilaw.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*11,987*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>/s/ September 20, 2024</u>          <u>/s/ Roya Vasseghi</u>
                                                            *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 20th day of September, 2024, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Robert M. Hardy
Senior Assistant County Attorney
OFFICE OF THE COUNTY ATTORNEY
12000 Government Center Pkwy.
Suite 549
Fairfax, VA 22035
Tel: (703) 324-2421
Fax: (703) 324-2665
robert.hardy@fairfaxcounty.gov

*Counsel for Appellee*

I further certify that on this 20th day of September, 2024, I caused a copy of the Sealed Volumes of the Joint Appendix to be served, via email with written consent, upon counsel for the Appellee, at the above address.

/s/ Roya Vasseghi
*Counsel for Appellant*