NO. 24-1636

# United States Court of Appeals
### *for the*
# Fourth Circuit

———————————

EDWARD M. WILLIAMS,

*Plaintiff-Appellant,*

– v. –

FAIRFAX COUNTY GOVERNMENT,

*Defendant-Appellee,*

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES,

*Defendant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA
IN NO. 1:23-CV-01004-MSN-IDD

═══════════════════════════════

## BRIEF OF APPELLEE (REDACTED)

═══════════════════════════════

JAMIE M. GREENZWEIG
FAIRFAX COUNTY ATTORNEY'S OFFICE
12000 Government Center Parkway,
  Suite 549
Fairfax, Virginia 22035
(703) 324-2421

*Attorneys for Defendant-Appellee*

CP COUNSEL PRESS     (800) 4-APPEAL • (321000)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1636 _____ Caption: Edward M. Williams v. Fairfax County Government _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Fairfax County Government _____
(name of party/amicus)

_____

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____ 07/26/2024 _____

Counsel for: Fairfax County, appellee

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

I.   ISSUES PRESENTED ........................................................... 1

II.  STATEMENT OF THE FACTS ............................................... 2

III. PROCEDURAL HISTORY ..................................................... 16

IV.  RULINGS PRESENTED FOR REVIEW .................................... 18

V.   SUMMARY OF ARGUMENT ................................................. 19

VI.  STANDARD OF REVIEW ...................................................... 21

VII. LEGAL ARGUMENT ............................................................ 22

     A.   Williams' retaliation claim was properly dismissed because
          the record is devoid of any evidence of a causal relationship
          between his protected activity and a materially adverse action ......... 22

     B.   Williams' retaliation claim was properly dismissed because
          the County produced ample evidence of its legitimate, non-
          retaliatory reasons for separating Williams from his
          probationary County employment ........................................... 27

     C.   Williams' retaliation claim was properly dismissed because
          he failed to adduce any evidence that the County's reasons for
          separating him from his probationary County employment
          were mere pretext or that retaliation was the real reason for
          his separation ................................................................ 32

     D.   Williams' retaliation claim was properly dismissed because
          he failed to adduce evidence to establish a genuine issue of
          material fact .................................................................. 35

     E.   Williams' retaliation claim was properly dismissed because
          he failed to adduce evidence to support his retaliation claim
          under the cat's paw theory of liability ................................... 37

VIII. CONCLUSION .................................................................. 40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................21

*Brown v. Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) .............................................18

*Burlington N. & Santa Fe Ry. Co.  v. White*,
  548 U.S. 53 (2006)...................................................... 22, 27

*Cavallo v. Star Enter.*,
  100 F.3d 1150 (4th Cir. 1996) ...........................................19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................22

*Chesapeake & Ohio Ry. Co. v. Martin*,
  283 U.S. 209 (1931).........................................................36

*Dash v. Mayweather*,
  731 F.3d 303 (4th Cir. 2013) .............................................37

*DeJarnette v. Corning, Inc.*,
  133 F.3d 293 (4th Cir. 1998) .............................................34

*Diamond v. Bea Maurer, Inc.*,
  128 Fed. App'x 968 (4th Cir. 2005) ...................................30

*E.E.O.C. v. Navy Fed. Credit Union*,
  424 F.3d 397 (4th Cir. 2005) .............................................27

*Edwards v. City of Goldsboro*,
  178 F.3d 231 (4th Cir. 1999) .............................................19

*Evans v. Int'l Paper Co.*,
  936 F.3d 183 (4th Cir. 2019) .............................................22

*Evans v. Tech. Applications & Serv. Co.*,
  80 F.3d 954 (4th Cir. 1996) ......................................... 29-30

*Foster v. Univ. of Md. E. Shore*,
  787 F.3d 243 (4th Cir. 2015) .............................................32

*Garrett v. Cape Fox Facilities Servs.*,
  2020 WL 265869 (E.D. Va. Jan. 17, 2020) .........................................................27

*Grayson O Co. v. Agadir Int'l*,
  856 F.3d 307 (4th Cir. 2017) ..............................................................................18

*Harrods Ltd. v. Sixty Internet Domain Names*,
  302 F.3d 214 (4th Cir. 2002) ......................................................................... 31-32

*Hawkins v. PepsiCo, Inc.*,
  203 F.3d 274 (4th Cir. 2000) ..............................................................................34

*Hicks v. Ferreyra*,
  965 F.3d 302 (4th Cir. 2020) ..............................................................................28

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
  354 F.3d 277 (4th Cir. 2004) ..............................................................................39

*Hux v. Newport News, Va.*,
  451 F.3d 311 (4th Cir. 2006) ..............................................................................35

*Ingram v. D.C.*,
  Civil Action No. 18-1598, 2021 WL 3268379 (D.D.C. July 30, 2021) ........ 30, 31

*Jacobs v. N.C. Admin. Office of the Cts.*,
  780 F.3d 562 (4th Cir. 2015) ..............................................................................21

*Jiminez v. Mary Wa. Coll.*,
  57 F.3d 369 (4th Cir. 1995) ................................................................................32

*Johnson v. United Parcel Serv., Inc.*,
  839 F. App'x 781 (4th Cir. 2021) .......................................................................23

*Kingery v. Quicken Loans, Inc.*,
  629 Fed. App'x  509 (4th Cir. 2015) ............................................................. 35, 36

*Kinser v. United Methodist Agency for the Retarded--W. N.C., Inc.*,
  613 F. App'x 209 (4th Cir. 2015) .......................................................................21

*Lacy v. Amtrak*,
  205 F.3d 1333 (4th Cir. 2000) ...................................................................... 21, 22

*Luh v. J.M. Huber Corp.*,
  211 Fed. App'x 143 (4th Cir. 2006) ...................................................................36

*O'Connor v. Consol. Coin Caterers Corp.*,
  56 F.3d 542 (4th Cir. 1995) ................................................................................30

iii

*Penley v. McDowell Cnty. Bd. of Educ.*,
   876 F.3d 646 (4th Cir. 2017) ................................................28

*Price v. Thompson*,
   380 F.3d 209 (4th Cir. 2004) ...............................................28

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) .............................................................35

*Smith v. Estes Exp.*,
   2009 WL 1009956 (E.D. Va. Apr. 14, 2009) ........................24

*Smyth-Riding v. Scis. & Eng'g Servs., LLC*,
   699 F. App'x 146 (4th Cir. 2017) .........................................38

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) ...................................................... 38, 39

*Strickland v. Sears, Roebuck & Co.*,
   693 F. Supp. 403 (E.D. Va. 1988) ........................................30

*Tankesley v. Vidal*,
   No. 1:21-CV-I448, 2023 WL 4273763 (E.D. Va. June 29, 2023) ......................27

*Thompson v. Potomac Elec. Power Co.*,
   312 F.3d 645 (4th Cir. 2002) ...............................................21

*United States v. Andres*,
   No. 23-4196, 2024 WL 4200043 (4th Cir. Sept. 16, 2024)..................18

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ................................................ 22, 23, 39

*Ze-Ze v. Kaiser Permanente Mid-Atl. States Regions, Inc.*,
   833 F. Supp. 2d 543 (E.D. Va. 2011) ...................................30

**Statutes & Other Authorities:**

42 U.S.C. § 2000(e) ...................................................................17

42 U.S.C. § 2000e-3(a) .............................................................22

Fed. R. App. P. 28.....................................................................18

Fed. R. App. P. 28(a)(9)(A) .......................................................18

Fed. R. Civ. P. 56(a)......................................................... 17, 21

Fed. R. Civ. P. 56(d) ........................................................ 31, 32

## I.    ISSUES PRESENTED

A.    Whether the district court properly dismissed Edward Williams'
(Williams) retaliation claim, where he failed to adduce evidence to
establish the requisite causal connection between his protected activity
and his separation from his probationary employment with Fairfax
County (County).

B.    Whether the district court properly dismissed Williams' retaliation
claim, where the County proffered ample evidence of its legitimate
non-retaliatory reason for separating him from employment.

C.    Whether the district court properly dismissed Williams' retaliation
claim, where he failed to adduce evidence to establish that the
legitimate non-retaliatory reasons proffered by the County for his
separation from employment were mere pretext.

D.    Whether the district court appropriately considered uncontroverted
evidence and properly granted summary judgment where Williams
failed to establish a genuine dispute of material fact.

E.    Whether the district court properly dismissed Williams' retaliation
claim, where he failed to adduce evidence to establish a retaliation
claim under the cat's paw theory of liability.

## II.    STATEMENT OF THE FACTS

On July 22, 2019, Williams was hired as a Child Protective Services (CPS)

Supervisor for the Fairfax County Department of Family Services' (DFS) Children

Youth and Families Division (CYF).[1] (JA 272; JA 276; JA 338-344). As a new

hire, Williams was a probationary employee.[2] (JA 358-359, ¶ 8; JA 629-630).

Throughout his entire tenure as a CPS Supervisor, Williams' direct supervisor was

Karen DeMijango (DeMijango). (JA 358-359, ¶¶ 5, 8-9; JA 613-614). DeMijango

in turn reported directly to Oriane Eriksen (Eriksen), the Division Director of CYF,

who reported directly to Michael Becketts (Becketts), the Director of DFS.[3] (JA

358-359, ¶ 5; JA 624, ¶ 3).

As a CPS Supervisor, Williams was required to oversee the daily operations

related to responses to reports of child abuse or neglect by the CPS Specialists in

---

[1] CYF administers various programs in the child welfare continuum, including the
CPS program, which is designed to intervene and protect children from abuse and
neglect. Specifically, CPS responds to reports of abuse and neglect of children and
performs family assessments and investigations related to such reports. (JA 353-
354, ¶¶ 2-3).

[2] The purpose of the probationary period is "for closely observing the employee's
work, for obtaining the most effective adjustment of a new employee to his/her
position, and for separating any new employee . . . whose performance does not
meet the performance requirements." (JA 358-359, ¶8).

[3] Like Williams, Eriksen and Becketts are also members of the LGBTQ+
community and have same-sex partners. (JA 355, ¶ 8; JA 1643, ¶ 6).

his unit.[4] (JA 338-344). He was also expected to provide guidance and supervision to the CPS Specialists in his unit throughout the course of every family assessment and investigation.[5] (JA 339-344, JA 36-69). Within Williams' first week of employment, DeMijango forwarded him an email she had recently sent to all CPS Supervisors regarding her expectations for the weekly supervision meetings (hereinafter "weekly supervision") that CPS Supervisors were required to have with each of the CPS Specialists in their unit. (JA 641-642). Specifically, DeMijango directed all CPS Supervisors to enter weekly supervision notes in the Online Automated Services Information System (OASIS),[6] and that "[e]ach note should have a summary of what the worker reported to you…and your guidance on next steps," and to "check if staff are adding their documentation weekly." (JA 641-642) In September 2019, DeMijango provided Williams with further guidance regarding weekly supervision, including a guide to use for his weekly supervision

---

[4] The terms "case" and "referral" are used interchangeably for case referrals handled by CPS for a family assessment or investigation. (JA 1599, ¶ 21).
[5] The manner in which CPS handles family assessments and investigations is mandated in guidelines set forth in Part C, Chapter 4 of the Virginia Department of Social Services (VDSS) Child and Family Services Manual. (JA 378-561).
[6] OASIS is the state system that the County utilizes to track child protective services case information. (JA 1596, ¶9).

with the CPS Specialists in his unit.[7] (JA 650-651). As reflected in this guide,
Williams was required to "review each referral, one by one [and] enter supervision
note in OASIS . . . review the backlog . . . review documentation . . . [provide]
professional development . . . [and] review worker's calendar." (JA 650-651).

Soon after Williams was hired, concerns were raised about his handling of a
particular case. (JA 300-305). This prompted program managers to ask Williams
whether he needed additional support to be successful in his role as a CPS
Supervisor. Williams responded that he "need[ed] somebody on the ground with
[him] at least for a few weeks." (JA 304). In response to Williams' request, in
September 2019, DFS assigned Sonia Aronow (Aronow), an exempt temporary
hire, to be a resource to assist Williams with the transition to processing cases in

---

[7] The expectation that Williams conduct weekly supervision with each of the CPS
Specialists in his unit was also reiterated in an email from DeMijango to Williams
on September 25, 2019. (JA 644-645). That email also reflected the expectation
that Williams review and sign all safety plans. (JA 644-645). These expectations
were again reiterated on December 15, 2019, in an email from DeMijango to
Williams that included a reminder that Williams was required to review each
referral being staffed as well as safety plans, medical reports, police reports,
doctor's notes, and pictures during each weekly supervision. (JA 647-648).
DeMijango also emphasized that "[t]he most important thing to type in OASIS is
your guidance on next steps," and that it was important to "make sure that all steps
make sense and that the worker has completed a comprehensive and holistic
assessment/investigation on ALL referrals." (JA 647-648). (emphasis in original).

Fairfax County and to coach and help him succeed as a CPS Supervisor.[8] (JA 300-305; JA 109, ¶ 48; JA 137, ¶ 48).

Beginning on September 9, 2019, "Williams frequently met with Aronow so that he could work on learning the State and County laws regarding child welfare as well as to learn other skills that would be useful for him in his supervisory capacity related to his [job as a CPS Supervisor]." (JA 113, ¶72; JA 138, ¶72). In November 2019, DeMijango asked Aronow to provide additional support to Williams by increasing the frequency of her coaching. (JA 1597, ¶14). Williams admitted that in November 2019, he requested that Aronow remain as his coach because he needed guidance and support. (JA 110, ¶54).

By January 10, 2020, Williams informed DeMijango that he was finally ready to take on his unit on his own and he no longer required Aronow's coaching support. (JA 336-337; JA 1720, ¶ 15). DeMijango approved Williams' request to discontinue Aronow's coaching support, and it was agreed that one or two last coaching sessions would be scheduled, after which Aronow's services would be concluded. (JA 337; JA 659-660; JA 1649; JA 1597-1598, ¶ 15).

---

[8] Aronow was a retired CPS Supervisor. When Aronow returned to the County in an exempt temporary position, she did not have any supervisory authority over Williams or any other County employee. (JA 1597, ¶ 12; JA 1643, ¶ 7; JA 605-612).

On January 15, 2020, DeMijango met with Williams to discuss his mid-year review. (JA 670-675). Based on her knowledge of his performance to date, DeMijango rated him as "Meets - Developmental Opportunity," the middle rating, for all six rating categories.[9] (JA 670-675; JA 1598, ¶16). After meeting with DeMijango, Williams met with Aronow for his previously scheduled coaching session. (JA 319-320; JA 677-680). At the outset of his meeting with Aronow, Williams stated, "Hi Sonia, I just got my evaluation, I would love for you to look it over with me." (JA 319-320). After a brief exchange, Aronow suggested to Williams that he should be more mindful of his environment before discussing his husband because he seemed like the type of person who just wanted to get it out there up front and make people deal with it or not. Williams agreed that he is "kind

---

[9] Throughout his Opening Brief, Williams repeatedly asserts that the Unsatisfactory Service Separation memorandum (USS) is "riddled with falsities," however, the only purportedly inaccurate statement identified by Williams is a reference to concerns expressed by DeMijango on his mid-year review that his performance was not improving. On this point, the mid-year review speaks for itself and clearly identifies numerous areas in which Williams' work performance continued to require significant improvement. (JA 670-675). Contrary to Williams' characterization of his work performance record as "exemplary" and "stellar," the mid-year review expressly noted that continued improvement in Williams' work performance was required in many areas, including, for example, in relation to his completion of required tasks associated with benchmarks, taking initiative to address problems related to the administration of completing his work, learning policies and procedures as a CPS Supervisor, understanding the many demands and attention that all CPS referrals require, and finding ways to structure and manage the different administrative tasks associated with his responsibility as a new CPS Supervisor in Fairfax County, etc. (JA 670-675).

of that way," but that he has a right to talk about his husband if he chooses to do so because he has a right to be married in this country and he is legally married. According to Williams, Aronow responded that some people may feel as though he is challenging or testing them and may be bothered by it such that Williams would have to be willing to accept the consequences that may come with that. Williams questioned what Aronow meant by "consequences," and shared a conversation he had with Eriksen wherein Eriksen endorsed his openness regarding his sexual orientation and encouraged him to be upfront about it. Aronow reiterated that some people prefer not to share information about their private lives, to which Williams again responded that whether to do so was their choice. (JA 319-320; JA 677-680; JA 1643, ¶6).

On January 16, 2020, Williams reported the conversation he had with Aronow to DeMijango and informed her that he would be making a complaint with Human Resources (HR) and the Equal Employment Opportunity Commission ("EEOC"). (JA 677-680). Williams admitted that DeMijango was "appalled" by Aronow's comment and "supported his plan" to make a complaint. (JA 676-680; JA 683). DeMijango informed Williams, "I will cancel your last session with Sonia [Aronow] next week. You don't have to meet with her again, nor do you have to talk to her." (JA 677-680). DeMijango also offered to support Williams with anything he needed in making a complaint and going through the process,

7

including time to use the County's Employee Assistance Program (EAP) resources. (JA 687-690).

Following his conversation with DeMijango, Williams went to DFS Human Resources and met with the HR Generalist for CYF, Khamla Kawahara (Kawahara). (JA 323-324; JA 708-709). During that meeting, Williams shared the details of his January 15, 2020, conversation with Aronow. (JA 323-324). Kawahara informed Williams that she would share his complaint with her supervisor, Robyn Walden (Walden), for further guidance and to investigate what occurred and whether the allegations rose to the level of discriminatory conduct. (JA 324-326; JA 710-715).

On the same day that she met with Williams, Kawahara also met with Walden and recounted the details of Williams' complaint to her. (JA 715; JA 728). Kawahara and Walden then prepared a list of questions and called Aronow to interview her regarding Williams' complaint. (JA 728-729). During that telephonic interview on January 16, 2020, Aronow admitted that she made the comment that Williams complained of, explaining that her intention in doing so was to share her perspective and guidance regarding boundaries. (JA 716-718; JA 729-734). In concluding their January 16, 2020, telephonic interview, Walden directed Aronow not to have any more communications with Williams. (JA 719; 730-731).

8

On January 21, 2020, Williams emailed a written statement memorializing his January 15, 2020, conversation with Aronow to Kawahara. (JA 677-680). According to Williams, that written statement captured the entirety of his conversation with Aronow. (JA 318; JA 328). In reaching a decision as to Williams' complaint, Walden and Kawahara reviewed the information provided by Williams, the admission made by Aronow, and EEOC guidance regarding the definition of discrimination. (JA 747; JA 1050-1052). It was ultimately determined that while Aronow's comment was inappropriate and did not align with the values of Fairfax County, it did not rise to the level of discrimination because the comment was neither severe nor pervasive. (JA 747; JA 1088). On January 31, 2020, Aronow was counseled that her comment was inappropriate and did not align with the County's values. (JA 1088). Shortly thereafter, on February 28, 2020, Aronow's employment with the County ended. (JA 625, ¶ 7). Williams did not have any interactions with Aronow after January 15, 2020, and he does not contend that he was subjected to harassment based on his sexual orientation after that date. (JA 280-282; JA 1643, ¶ 7).

Following Williams' mid-year review on January 15, 2020, DeMijango did not have significant concerns regarding his work performance until April 10, 2020. (JA 1615-1626). ████████████████████████████

████████████████████████████







 DeMijango's expectations in this

regard had been repeatedly communicated to Williams throughout his employment

with the County. (JA 371-376; JA 640-648; JA 1646-1653; JA 1601, ¶ 27). As

outlined *supra*, DeMijango's expectations in this regard were rooted in County and

VDSS policies, pursuant to which Williams was required to sign off on all safety

plans, conduct weekly supervision meetings with the CPS Specialists in his unit,

and document the information reported to him and his guidance on next steps

during those weekly supervision meetings. (JA 370-376; JA 640-648).

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

On April 16, 2020, DeMijango communicated her concerns to Eriksen,

causing Eriksen to become similarly concerned. (JA 1601, ¶ 28; JA 1643-1644, ¶¶

9-10). Based on their shared concerns, it was agreed that DeMijango would

conduct a review of the open CPS referrals in Williams' unit. (JA 1601, ¶ 28; JA

1643-1644, ¶¶ 9-10). After reviewing several of these open CPS referrals,

DeMijango's concerns were exacerbated, thus prompting her to request an analysis

by CYF Quality Programs of the case referrals closed by Williams' unit. (JA 1585-

1587; JA 1601, ¶ 29; JA 1643-1644, ¶¶ 9-12).

On April 17, 2020, Eriksen met with Sandra Slappey (Slappey), the Quality

Assurance Manager for CYF Quality Programs, to direct her to conduct a review

of case referrals that were closed by Williams' unit, while DeMijango continued her review of Williams' open cases. (JA 755-776, ¶ 3; JA 1644, ¶ 11). The purpose of the case review was to determine whether the issues that gave rise to Eriksen's concerns were reflective of a prevalent pattern of failing to meet state-mandated requirements related to child safety and risk. (JA 755-756 ¶ 3; JA 1644, ¶11). From April 20-24, 2020, CYF Quality Programs randomly sampled 24 of the 50 referrals closed in Williams' unit during the months of January, February, and March for review. That review consisted of comparing the timeliness and/or completion of various key actions mandated by VDSS guidelines. (JA 756, ¶¶ 5-6; JA 1669-1674; JA 1806-1809). To glean information regarding the timelines and/or completion of actions mandated by VDSS guidelines, CYF Quality Programs considered data reflected in the referral notes. (JA 756, ¶ 6; JA 1806-1809).

A review of data reflected in referral notes revealed that Williams had approved the closure of over 50% of the cases in his unit "without making a determination as to whether the involved children were safe from abuse or neglect," and that safety plans "lacked reasonable safeguards to address identified safety concerns" in nearly 2/3 of the cases in his unit. (JA 1806-1809). The review also uncovered numerous other significant failures, including, *inter alia*, the failure to make appropriate referrals in nearly 2/3 of the cases, the failure to provide clear supervisory guidance in 3/4 of the cases, and the failure to elicit information

needed to adequately assess child safety and risk in 2/3 of the cases. (JA 1806-1809). Slappey documented the findings made pursuant to the case review, which she submitted to Eriksen and DeMijango on April 26, 2020.[12] (JA 757, ¶ 7; JA 1644-1645, ¶ 13). The same deficiencies were identified in the case review of open cases in Williams' unit, which was completed by DeMijango on April 28, 2020. (JA 1803-1805).

In sum, the reviews conducted by Slappey and DeMijango revealed numerous egregious errors and deficiencies in Williams' work performance as it related to his primary functions as a CPS Supervisor, including failing to put safety plans into place or monitor them, failing to appropriately assess child abuse and neglect cases, not providing supervisory guidance, and non-completion of state-mandated administrative tasks and documentation. (JA 1601, ¶ 29; JA 1803-1809).

On April 29, 2020, Eriksen sent the Slappey and DeMijango reports to Becketts, which he promptly reviewed. (JA 354, ¶¶ 4-6; JA 1802-1809; JA 1645, ¶ 14). Based on her concerns regarding child safety, Eriksen recommended to Becketts that Williams be separated from his probationary County employment. (JA 354, ¶¶ 4-6; JA 619-621; JA 1645, ¶ 15). Becketts reviewed the Slappey and

---

[12] Slappey did not have any communications with anyone, nor did she consider Williams' sexual orientation, same-sex marriage, or January 16, 2020, complaint in conducting her case review or in drafting her report. (JA 757, ¶¶ 7-8; JA 1644, ¶ 12).

DeMijango reports and he ultimately concurred with Eriksen's recommendation. (JA 1678-1693; JA 354, ¶ 6). On May 6, 2020, Becketts separated Williams from his probationary County employment based on his failure to meet the minimum standards of performance for the CPS Supervisor position in three key areas: child safety assessment, supervisory guidance, and safety and monitoring safety plans. (JA 762-763; JA 354-355, ¶¶ 4-10).

## III.   PROCEDURAL HISTORY

On January 22, 2021, Williams filed a Charge of Discrimination with the EEOC, in which he alleged claims of sexual orientation discrimination and retaliation against the County.[13] (JA 1132). On April 28, 2023, the EEOC issued a Notice of Right to Sue and on July 27, 2023, Williams filed a Complaint alleging sexual orientation discrimination, hostile work environment, and retaliation claims against the County pursuant to Title VII of the Civil Rights Act of 1964, as

---

[13] In his Opening Brief, Williams references the County's argument regarding his failure to timely raise his sexual orientation discrimination and hostile work environment claims with the EEOC. (JA 252-253). Contrary to assertions made in the Opening Brief, this argument has never been abandoned or waived by the County. As outlined *infra*, Williams has not requested appellate review of his sexual orientation discrimination or hostile work environment claims. *See infra* Section IV, Rulings Presented for Review. Therefore, the County's argument regarding the untimely nature of such claims is moot and will not be addressed herein. To the extent that this Court determines that Williams has presented issues regarding his sexual orientation and/or hostile work environment claims for review, the County incorporates by reference and relies upon the arguments set forth in its memoranda in support of summary judgment. (JA 1539-1570; JA 2080-2101).

amended, 42 U.S.C. § 2000(e), *et seq.* (JA 10-36; JA 103-132). Following the

close of discovery, the County moved for summary judgment pursuant to Fed. R.

Civ. P. 56(a), which was opposed by Williams. (JA 235-236; JA 237-267; JA

1539-1570; JA 1399-1431; JA 2080-2101.) A hearing on the County's motion for

summary judgment was held before the Honorable Michael S. Nachmanoff on

June 7, 2024. (JA 1466; JA 2103-2140.) On that date, the district court entered an

order granting the County's motion for summary judgment. (JA 1467; JA 2103-

2140.) On July 8, 2024, Williams timely noted his appeal to this Court. (JA 1473-

1474.)

## IV.    RULINGS PRESENTED FOR REVIEW

By order dated June 7, 2024, the district court granted the County's motion

for summary judgment on all of Williams' claims; (sexual orientation

discrimination (Count I), hostile work environment (Count II), and retaliation

(Count III)). (JA 1467). On appeal, Williams generally asserts that the district court

erred in granting summary judgment, but he makes no more than a passing

reference to his sexual orientation discrimination (Count I) and hostile work

environment (Count II) claims. This does not satisfy Federal Rule of Appellate

Procedure 28. *See* Fed. R. App. P. 28(a)(9)(A) (argument section must contain

"appellant's contentions and the reasons for them, with citations to the authorities

and parts of the record on which the appellant relies"). Having failed to present any

issues or develop any argument as to his sexual orientation discrimination and/or hostile work environment claims in his Opening Brief, Williams has waived appellate review of the district court's dismissal of those claims. *United States v. Andres*, No. 23-4196, 2024 WL 4200043, at \*4 (4th Cir. Sept. 16, 2024) (citing *Grayson O Co. v. Agadir Int'l*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in [its] opening brief or by failing to 'develop its argument'—even if its brief takes a passing shot at the issue."); *see also Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015) (explaining that the Court finds waiver "whenever a party fails to 'develop [his] argument'—even if his brief takes a passing shot at the issue"); *Edwards v. City of Goldsboro*, 178 F.3d 231, 237 n.1 (4th Cir. 1999) ("abandonment of claim on appeal is triggered when appellant fails, with respect to a particular claim, to comply with rule requiring that *argument section of opening brief* contain appellant's contentions and reasons for them, with citations to authorities and parts of record on which appellant relies" (emphasis added)); *Cavallo v. Star Enter.*, 100 F.3d 1150 (4th Cir. 1996) (explaining that arguments not raised on appeal by appellants until their reply brief were not properly before Court of Appeals, regardless of whether question was raised in district court). Because Williams has waived appellate review of the district court's dismissal of his sexual orientation discrimination and hostile work environment

claims, the rulings before this court are limited to those concerning Williams'

retaliation claim.[14]

## V.     SUMMARY OF ARGUMENT

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

     Williams' Opening Brief is completely devoid of any legitimate response or

explanation for why an audit of his case files in April 2020 found, *inter alia*, that

he approved the closure of over 50% of the cases in his unit "without making a

---

[14] Because the district court's rulings on Williams' sexual orientation
discrimination and hostile work environment claims are not before this Court, they
will not be substantively addressed herein. To the extent that this Court determines
that Williams has presented issues regarding his sexual orientation and/or hostile
work environment claims for review, the County incorporates by reference and
relies upon the arguments set forth in its memoranda in support of summary
judgment. (JA 1539-1570; JA 2080-2101).

determination as to whether the involved children were safe from abuse or neglect" and that safety plans "lacked reasonable safeguards to address identified safety concerns" in nearly two-thirds of the cases sampled.

Becketts reviewed the reports prepared by Slappey and DeMijango regarding referrals that were handled by Williams' unit. After considering the objective findings of severe deficiencies in Williams' work performance that directly affected child welfare, Becketts made the decision to separate Williams from his probationary County employment based on his failure to meet the minimum standards of performance for the CPS Supervisor position in three key areas: child safety assessment, supervisory guidance, and safety and monitoring safety plans. Williams has failed to adduce any evidence from which it may be inferred that these reasons for his separation were false or that the "real reason" for his separation was retaliation for his January 16, 2020, complaint against Aronow.

## VI.    STANDARD OF REVIEW

This Court's review of a district court's ruling on a motion for summary judgment is *de novo*. *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 565 n. 1 (4th Cir. 2015). "A district court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* at 568 (quoting Fed. R. Civ. P. 56(a)). In determining whether a genuine issue of material fact exists, the facts and all

justifiable inferences arising therefrom should be viewed in the light most favorable to the nonmoving party. *Id.* at 565, n. 1. However, "[t]he nonmoving party must provide '*specific facts* showing that there is a genuine issue for trial.'" *Lacy v. Amtrak*, 205 F.3d 1333 *2 (4th Cir. 2000) (emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[C]onclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's case]." *Kinser v. United Methodist Agency for the Retarded--W. N.C., Inc.*, 613 F. App'x 209, 211 (4th Cir. 2015) (quoting *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, summary judgment is appropriate if the evidence before the court lacks sufficient specific facts on which a reasonable juror could find for the nonmoving party. *Lacy*, 205 F.3d at *2.

## VII.  LEGAL ARGUMENT

### A.  Williams' retaliation claim was properly dismissed because the record is devoid of any evidence of a causal relationship between his protected activity and a materially adverse action.

Title VII's anti-retaliation provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice

by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), citing 42 U.S.C. § 2000e-3(a). To establish a claim of retaliation in violation of Title VII, a plaintiff must prove: (1) that he engaged in protected activity, (2) that the employer took a materially adverse action against him, and (3) there is a causal connection between the protected activity and the adverse action. *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (citing *Burlington N. & & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–68 (2006)).

At summary judgment, it was not disputed that Williams engaged in protected activity when he made a complaint against Aronow in January 2020, nor was it disputed that Williams' separation from employment constituted a materially adverse action. Summary judgment was appropriate, however, because Williams failed to present evidence that would establish a causal connection between his complaint and his separation from employment.

As to the causation prong of a *prima facie* retaliation case, a plaintiff is required to prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013). There are two routes through which a plaintiff may attempt to meet this burden. "First, a plaintiff may establish that the adverse act bears

sufficient temporal proximity to the protected activity. Second, a plaintiff may establish the existence of other facts that alone, or in addition to temporal proximity, suggests that the adverse employment action occurred because of the protected activity.*" Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021) (internal citations omitted).

In his Opening Brief, Williams concedes that the four-month time lapse between his complaint and his separation is insufficient alone to establish a causal connection. Instead, he argues that there was other evidence of retaliatory animus from which a causal connection could be inferred. Williams claims that other instances of retaliatory animus include the County's purportedly flawed investigation and failure to take appropriate remedial action in response to his complaint against Aronow, and DeMijango's nitpicking of his work in Spring 2020.[15] Contrary to Williams' assertions, the record clearly established that the

---

[15] In his Opening Brief, Williams attempts to argue that he initially engaged in protected activity in November 2019, when he met with Eriksen to express his concern that Aronow openly disagreed with him about live cases in meetings with his staff, and the lack of support he was receiving from DeMijango. As a matter of law, Williams' meeting with Eriksen in November 2019 does not constitute protected activity. Title VII's anti-retaliation provisions certainly protect against complaints about sexual orientation discrimination, but "they do not protect against complaints of work conditions that are not based on any sort of discriminatory motive." *Smith v. Estes Exp.*, 2009 WL 1009956, at *9 (E.D. Va. Apr. 14, 2009). Here, Williams admitted that he never mentioned his sexual orientation during his November 2019 meeting with Eriksen. (JA 315 ("Q: In your meeting with Ms. Eriksen in November of 2019, you did not make any statement that you believe

(Footnote cont'd.)

County conducted a thorough investigation and took prompt remedial action that

effectively stopped the allegedly harassing conduct about which Williams

complained.

Furthermore, the County has an anti-harassment policy, PM 39-06, which

was in effect throughout Williams' employment. (JA 692-704).  In addition to

prohibiting harassment, discrimination, and retaliation, PM 39-06 also describes

the manner in which any reports of harassment, discrimination, and retaliation can

be made. (JA 697-699). Specifically, pursuant to PM 39-06, such reports can be

made to the employee's supervisor, department head, the department's human

resources manager or EEO officer, or the County's Office of Human Rights and

Equity Programs.[16] (JA 698). PM 39-06 also includes information regarding the

_____

Ms. Aronow was discriminating against you because of your sexual orientation,
correct? A: No, I did not.")).

[16] Williams asserts that he was subjected to retaliation when Kawahara purportedly
failed to advise him of his right to report his complaint against Aronow to the
County's Office of Human Rights and Equity Programs (OHREP) and when she
asked him to let the County investigate his complaint as opposed to filing a Charge
with the EEOC. Such assertions do not support Williams' retaliation claim,
however, because it was undisputed that information regarding the policies and
procedures for filing an EEOC Charge and/or complaint with OHREP are set forth
in PM 39-06, and that Williams was aware of and familiar with PM 39-06 as a
supervisor. (JA 293). As such, Williams cannot genuinely claim that he was
unaware of his right to file a Charge with the EEOC and/or a complaint with
OHREP, or the policies and procedures by which he could have done so. Williams'
assertion that he was discouraged from pursuing a complaint with the EEOC was
also contradicted by his own admission that DeMijango expressly supported his
plan to make a complaint to the EEOC and that she offered to support him with

(Footnote cont'd.)

procedure by which employees can file charges of harassment, retaliation and other

forms of discrimination with EEOC. (JA 698-699).

In accordance with PM 39-06, Williams initially reported his complaint to

DeMijango (his supervisor), who took prompt remedial measures in response

thereto. Specifically, DeMijango immediately cancelled Williams' last remaining

coaching session with Aronow and informed him that he was not required to speak

with Aronow again. (JA 679; JA 683; JA 321-323).  Indeed, Williams confirms

that he and Aronow did not thereafter speak or have any contact whatsoever with

each other. (JA 280-282). DeMijango also offered to support Williams with

anything he needed in making a complaint and going through the process,

including time to use EAP resources. (JA 679; JA 683; JA 321-323).  When

Williams reported his complaint to Kawahara in HR, she and Walden initiated an

investigation the very same day, which included an interview of Aronow, who

admitted to making the comment complained of by Williams.[17] (JA 716-717; JA

729; JA 732-734). They subsequently counseled Aronow that her comment was

---

anything he needed in making a complaint and going through the process. (JA 686-
690).

[17] Williams' claim that the investigation of his complaint against Aronow was
somehow lacking because Kawahara and Walden interviewed Aronow over the
phone instead of interviewing her in-person, or because they accepted a written
complaint from him instead of re-interviewing him in-person, is of no consequence
here. Williams points to no authority that indicates that telephonic or written
statements, as opposed to in-person interviews, evidence a retaliatory animus, and,
indeed, no such authority exists.

inappropriate and did not align with the County's values and shortly thereafter Aronow's employment with the County ended. Williams admitted that he did not have any interactions with Aronow after January 15, 2020, and he does not contend that he was subjected to harassment based on his sexual orientation after that date. The County's anti-harassment policy, coupled with the swift actions of DeMijango, Walden, and Kawahara effectively stopped any purported harassment. Williams cannot rely on assertions that are contradicted by the record evidence regarding the adequacy of the investigation and remedial actions taken by the County in an effort to mischaracterize those events as evidence of retaliatory animus in support of a causal connection.

Nor can Williams rely on increased scrutiny of his work performance (*i.e.*, DeMijango's purported "nitpicking"), as evidence of retaliatory animus. Though DeMijango's questioning may have caused Williams to feel overly scrutinized, such supervisory oversight amounts to nothing more than the type of minor annoyance that employees regularly endure as part of any workplace, and which do not rise to the level of material adversity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006); *Tankesley v. Vidal*, No. 1:21-CV-I448, 2023 WL 4273763, at *24 (E.D. Va. June 29, 2023) ("[I]ncreased scrutiny in the form of required status reports and one-on-one meetings do not meet the materially adverse standard."); *Garrett v. Cape Fox Facilities Servs.*, 2020 WL 265869, at *7 (E.D.

Va. Jan. 17, 2020) (finding that work-related criticism and scrutiny do not rise to the level of adverse employment actions).

> **B.** **Williams' retaliation claim was properly dismissed because the County produced ample evidence of its legitimate, non-retaliatory reasons for separating Williams from his probationary County employment.**

Even if Williams could demonstrate a *prima facie* case of retaliation, the County presented ample evidence that it had legitimate, non-retaliatory reasons for separating Williams from his probationary County employment. *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005) (If the plaintiff "establish[es] a *prima facie* case of retaliation, the burden shifts to the [employer] to articulate a legitimate, non-retaliatory reason for the adverse employment action.") █

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████



DeMijango shared her concerns with Ericksen, which then prompted an

audit of a sampling of Williams' both open and closed cases by both DeMijango

[18] In his Opening Brief, Williams implores this Court to find an inference of causation under the "first opportunity doctrine." At no point during the proceedings in the district court did Williams argue or even suggest that causation could be inferred here under the first opportunity doctrine; he raises this argument for the first time on appeal. As such, Williams has waived this argument, and it should be disregarded by this Court. *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (internal quotation marks and brackets omitted) ("It is well established that this court "do[es] not consider issues raised for the first time on appeal, absent exceptional circumstances.") Even if this Court considered Williams' new argument, it would fail because "[t]he 'first available opportunity' notion . . . is specific to the failure-to-hire context," and, as such it is inapplicable to the case at bar. *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 657 (4th Cir. 2017) (citing *Price v. Thompson,* 380 F.3d 209, 213 (4th Cir. 2004)).

and Slappey, an independent reviewer from CYF Quality Programs. Their findings

indicated that in an alarming 50% of the cases in Williams' unit were closed

"without making a determination as to whether the involved children were safe

from abuse or neglect" and that safety plans "lacked reasonable safeguards to

address identified safety concerns" in nearly 2/3 of the cases sampled. Based on

Willaims' failure to meet the minimum standards of performance in the key areas

of child safety assessment, supervisory guidance, and safety and monitory safety

plans, Becketts made the determination to separate Williams from his probationary

employment on May 6, 2020.

Poor job performance, especially poor performance that puts patients or

children at risk has been routinely held to be a legitimate, non-discriminatory

reason for discharge.[19] *See, e.g., Evans v. Tech. Applications & Serv. Co.*, 80 F.3d

---

[19] In his Opening Brief, Williams exclusively points to his mid-year evaluation as disputed "evidence" that his performance was adequate. He has wholly failed, however, to even argue that he was meeting the County's legitimate expectations *at the time of his separation*, over three months later. As noted by this Court, "acceptable job performance in the past does not establish acceptable job performance at the time of the termination." *Diamond v. Bea Maurer, Inc*., 128 Fed. App'x 968, 973 (4th Cir. 2005); *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d, 542, 547 (4th Cir. 1995) (holding that a positive review in January was irrelevant to the determination of whether the employee was performing adequately when terminated in August). The record contains uncontroverted evidence that at the time of Williams' separation from County employment, he was placing children at risk because of his failures in child safety assessment, lack of supervisory guidance, failure to put in place appropriate safety plans, and failing to monitor child safety.

954, 960 (4th Cir. 1996) (poor job performance is a "widely recognized . . . valid, non-discriminatory bas[is] for any adverse employment action"); *Ze-Ze v. Kaiser Permanente Mid-Atl. States Regions, Inc.*, 833 F. Supp. 2d 543, 549 (E.D. Va. 2011) ("Courts have long recognized that such poor performance provides a legitimate basis for taking an adverse employment action, and that compromising patient safety is a valid, nondiscriminatory reason for discharging an employee working in the medical profession."); *Strickland v. Sears, Roebuck & Co.*, 693 F. Supp. 403, 407 (E.D. Va. 1988) (poor performance is a legitimate non-discriminatory reason for discharge).

The situation at issue in *Ingram v. D.C.,* Civil Action No. 18-1598, 2021 WL 3268379 (D.D.C. July 30, 2021) is on all fours and provides persuasive authority on this point. In that case, the plaintiff worked for the D.C. Child and Family Services Agency as a supervisory social worker. *Id*. at *2.  Random audits of the plaintiff's caseload revealed that she was closing out abuse and neglect investigations prematurely in order to meet procedural deadlines and that this resulted in potential endangerment of children. *Id*. at *3. In line with cases from the Fourth Circuit, the court found that the plaintiff's refusal to follow her supervisor's directives and her failure to perform designated duties related to child abuse and neglect cases "are accepted as legitimate, nondiscriminatory reasons for an adverse action." *Id*. at *7.

In his Opening Brief, Williams refers to the investigation of his case referrals as a "baseless witch hunt," but also admits that the County had a "legitimate reason and requirement to investigate perceived shortcomings in the handling of a high-risk referral." Ultimately, Williams does not identify a single inaccuracy in the audits of his case referrals that were completed by DeMijango and/or Slappey, both of which primarily consist of objective data points associated with VDSS mandates, which were culled from information populated by Williams and his staff in the CPS electronic case referral system.[20]

---

[20] In his Opening Brief, Williams contends that he was unable to rebut evidence concerning the case reviews due to alleged "discovery practices and abuses." Williams has waived this argument, however, because he never submitted a declaration or affidavit necessary to request relief from the district court under Fed. R. Civ. P. 56(d). Under Rule 56(d), when facts are unavailable to a non-moving party, he or she may ask the district court to "(1) defer considering the motion or deny it;(2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." In making such request, the non-moving party is required to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition. *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) ("If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a [Fed. R. Civ. P. 56(d)] affidavit . . . [F]ailure to file an affidavit...is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.")

**C.    Williams' retaliation claim was properly dismissed because he failed to adduce any evidence that the County's reasons for separating him from his probationary County employment were mere pretext or that retaliation was the real reason for his separation.**

Because the County articulated a legitimate, non-retaliatory reason for separating Williams from his probationary County employment based on ample evidence in the record, the burden shifts back to Williams to prove by a preponderance of the evidence that the County's stated reasons were not its true reasons, but were pretext for retaliation. *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). (citation omitted). In order to carry this burden, Williams was required to establish "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Id. at* 252 (quoting *Jiminez v. Mary Wa. Coll.,* 57 F.3d 369, 378 (4th Cir. 1995)).

No evidence exists in the record from which it can be inferred that the reasons offered by the County for separating Williams from employment were merely pretext for retaliation. To the contrary, the evidence establishes that in making the decision to separate Williams, Becketts reviewed the data set forth in reports prepared by Slappey and DeMijango regarding referrals that were handled by Williams' unit. As set forth in detail *infra*, those reports clearly reflect that at the time of his separation, Williams was not meeting the minimum standards of performance of the CPS Supervisor position, whose primary role is to "assure the

33

safety and well-being of children, and to reduce the risk of child abuse and

neglect."



████████████████████████████

████████████████████████████

██████████████

Alternatively, Williams argues, without any support and contrary to the direct evidence in the record, that the case review findings made by DeMijango and Slappey were mere alleged deficiencies in his unit's paperwork or, alternatively, that there was no evidence that he put children's lives in danger and that at most "[he] should not have been fired; rather, he should have been counseled or given the opportunity to improve if there were issues." In his attempt to downplay his underlying conduct that led to his separation; however, Williams misunderstands the purpose of the pretext inquiry. "When an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Moreover, mere disagreements with the facts supporting an employee's termination does not establish that the decision was a pretext for unlawful employment discrimination. *Hux v. Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) (internal citations omitted) ("Once an employer has provided a non-discriminatory explanation for its decision, the

35

plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'").

> **D.** **Williams' retaliation claim was properly dismissed because he failed to adduce evidence to establish a genuine issue of material fact.**

Williams has not presented any evidence that would cast doubt on the validity of the County's explanation for is separation, nor has he provided any evidence whatsoever in support of pretext. Instead, in his Opening Brief, Williams contends that the district court should have simply ignored uncontroverted evidence and testimony from Aronow and all other witnesses who are County employees, because they are not disinterested witnesses and, therefore, the jury is not required to believe their testimony under *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000).  This exact argument was raised in *Kingery v. Quicken Loans, Inc.*, 629 Fed. App'x  509, 516–17 (4th Cir. 2015).  As this Court explained in *Kingery*, the Fourth Circuit has rejected the broad reading of *Reaves* that would require a district court considering a motion for summary judgment to ignore the uncontroverted testimony of all employees of a company moving for summary judgment.  *Id. (citing Luh v. J.M. Huber Corp.,* 211 Fed. App'x 143, 146 (4th Cir. 2006)). In so rejecting that broad reading of *Reeves*, this Court "began by

pointing out that '*Reeves* states the noncontroversial position that witness

testimony that the jury is not required to believe cannot be used to sustain a

summary judgment decision, since the jury is not required to believe their

testimony.' This Court then looked to the Supreme Court's holding in *Chesapeake*

*& Ohio Ry. Co. v. Martin,* 283 U.S. 209 (1931), that the testimony of an employee

of the defendant must be taken as true when such testimony discloses no lack of

candor, the employee witness went unimpeached, his credibility was not

questioned, and the accuracy of his testimony is not controverted by evidence,

although if it were inaccurate, it readily could be shown to be so." *Id. (quoting*

*Chesapeake & Ohio Ry. Co.,* 283 U.S. at 216.)  In this case, the status of a witness

as a current or former County employee is insufficient to create a jury question as

to his or her veracity.  *Kingery*, 629 Fed. App'x 509, 516–17.  There is no basis

upon which Williams can reasonably contend that the district court should have

ignored the uncontroverted testimony of current and former County employees in

deciding the merits of the County's motion for summary judgment.

Williams' suggestion that a jury could have found that the decision to

separate him from his probationary County employment was mere pretext and

actually carried out at the behest of "Aronow [who] had sway over DeMijango,

who, in turn had sway over Eriksen, who had sway over Becketts," is wholly

unsupported by the record and would require impermissible speculation.  Indeed,

in support of this argument on summary judgment, Williams cited only to his own deposition testimony wherein he was asked, "who told Mr. Becketts a narrative that you believe he signed off on?;" in response to which, Williams answered, "Well, my direct supervisor. I mean, I don't know Mr. Becketts, so it had to be my direct supervisor, I would assume, being in management for many years. Maybe her supervisor. Whoever could give him a narrative about whatever my work performance was – I would imagine that's how it goes in any big corporation or company – and then he signed off on it." (JA 1862). Williams' mere speculation and assumptions cannot create a genuine issue of material fact sufficient to survive summary judgment. *Dash v. Mayweather,* 731 F.3d 303, 311 (4th Cir. 2013) (to defeat summary judgment, "nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence")).

**E.    Williams' retaliation claim was properly dismissed because he failed to adduce evidence to support his retaliation claim under the cat's paw theory of liability.**

Under certain circumstances, a plaintiff who fails to establish a Title VII claim by direct evidence or the *McDonnell Douglas* test may be able to prevail under the cat's paw theory of liability. Under this theory, Williams was required to show that a supervisor motivated by some unlawful animus secured his separation from County employment through a recommendation to Becketts, the ultimate

38

decision-maker, who acted only as a rubber stamp and conducted no independent investigation. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011).

Here, Williams was unable to make this showing as, absent his bare assertions, he has failed to put forward any evidence to support such a claim. To the extent Williams argues that Aronow was somehow principally responsible for, or otherwise motivated, Beckett's decision to separate Williams from his probationary employment, there is no evidence from which a jury could find that she was a causal factor in his separation let alone the but for cause. Williams himself admitted that he had no further contact with Aronow after January 15, 2020, and that her employment with the County ended on February 28, 2020, almost two months earlier than the investigation into Williams' severely lacking performance and his ultimate separation. Moreover, there is no evidence whatsoever to suggest that Aronow was in any way consulted or even participated in this investigation or the decision to separate Williams from his probationary employment. Thus, there is no evidence that Aronow performed any act that was motivated by animus that was *intended* to cause Williams' separation. *See Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 699 F. App'x 146, 155 (4th Cir. 2017) ("[I]f a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate

cause of the ultimate employment action, then the employer is liable." (quoting *Staub*, 562 U.S. at 422-21) (alteration in original).

Additionally, to the extent Williams claims that Ericksen's recommendation to Becketts supports a cat's paw theory of liability, Williams has failed to put forward any evidence that Eriksen harbored any unlawful discriminatory or retaliatory animus when she made this recommendation. To the contrary, the evidence affirmatively establishes that Becketts did not act as a mere rubber stamp of Eriksen, but that he personally reviewed and considered the findings of severe deficiencies in Williams' work performance that directly affected child welfare in the County prior to making his decision to separate Williams from County employment. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004), abrogated in part on other grounds by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ("[W]hen the decision maker does not act as a 'mere rubber stamp, but ma[kes] an independent decision,' there can be no employer liability.") (citation omitted). As such, the district court correctly concluded that Williams was unable to prevail under a cat's paw theory.

## VIII. CONCLUSION

For the reasons stated herein, Fairfax County respectfully requests that the judgment of the district court granting its motion for summary judgment and dismissing Williams' Amended Complaint be affirmed.

ELIZABETH D. TEARE
COUNTY ATTORNEY


By _____/s/_____

    Jamie M. Greenzweig, Senior Assistant County Attorney
    Virginia Bar Number 75066
    Attorney for Fairfax County
    Office of the County Attorney
    12000 Government Center Parkway, Suite 549
    Fairfax, VA 22035-0064
    Phone: 703-324-2421
    Fax: 703-324-2665
    jamie.greenzweig@fairfaxcounty.gov

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Fed. R. App. P. 32(b) because it cites to both the paper appendix and the electronic record and contains 10,063 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

By _____/s/_____

Jamie M. Greenzweig, Senior Assistant County Attorney
Virginia Bar Number 75066
Attorney for Appellee/Fairfax County
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, VA 22035-0064
Phone: 703-324-2421
Fax: 703-324-2665
jamie.greenzweig@fairfaxcounty.gov

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that on October 21, 2024, I electronically filed a copy of this Brief of Appellee with the Clerk of the Court using the Court's Case Management/ Electronic Case filing ("CM/EMF") System, which will send a notification of electronic filing (NEF) to counsel of record for the Appellant, who is a registered CM/EMF user:

Roya Vasseghi
VASSEGHI LAW GROUP
9663-D Main Street
Fairfax, VA 22031
(703) 215-9358 Tel.
(703) 563-7401 Fax
roya@vasseghilaw.com
*Counsel for Appellant Edward Williams*

By _____/s/_____

Jamie M. Greenzweig, Senior Assistant County Attorney
Virginia Bar Number 75066
Attorney for Appellee/Fairfax County
Office of the County Attorney
12000 Government Center Parkway, Suite 549
Fairfax, VA 22035-0064
Phone: 703-324-2421
Fax: 703-324-2665
jamie.greenzweig@fairfaxcounty.gov